1          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF PUERTO RICO

2  :_____:

3    THE UNITED STATES OF AMERICA,    :
                Plaintiff,    :

4           vs.          :  Case No: 16-CR-282 TSH
                         :

5    [4] ROLANDO MILLAN-MACHUCA,    :
    a/k/a Rolo,               :

6    [6] MIGUEL RIVERA-CALCAÑO,     :
    a/k/a Guelo, Kikirimiau,     :

7    [7] ROBERTO CASADO-BERRIOS,     :
    a/k/a Bobe, Bobel,         :

8    [9] GIORDANO SANTANA-MELÉNDEZ,  :
    a/k/a Viejo Ten,           :

9               Defendants.     :
  :_____:

10

           TRANSCRIPT OF FURTHER JURY TRIAL

11     HELD BEFORE THE HONORABLE JUDGE TIMOTHY S. HILLMAN
  CLEMENTE RUIZ-NAZARIO U.S. COURTHOUSE, SAN JUAN, PUERTO RICO

12        MONDAY, JULY 2, 2018, BEGINNING AT 9:06 A.M.
  :_____:

13

14  A P P E A R A N C E S:

15  For the United States of America:

16       Assistant U.S. Attorney Victor O. Acevedo-Hernández

17       Assistant U.S. Attorney Scott H. Anderson

18  For Defendant [4] Rolando Millan-Machuca:

19       Attorney Lydia Lizarribar-Masini

20  For Defendant [6] Miguel Rivera-Calcaño:

21       Attorney José B. Vélez-Goveo

22  For Defendant [7] Roberto Casado-Berrios:

23       Attorney Jason González-Delgado

24  For Defendant [9] Giordano Santana-Meléndez:

25       Attorney Anita Hill-Adames

ALSO PRESENT:

      Omar Flaquer, Courtroom Deputy Clerk

      Enith Valdés, Court Interpreter

      Mary Jo Smith, Court Interpreter

      Carlos Laó, Government Interpreter

I N D E X

GOVERNMENT WITNESS                                          PAGE

ALEX MIGUEL CRUZ-SANTOS
    Cross Examination By Ms. Hill-Adames.............5
    Cross Examination By Mr. Vélez-Goveo.............22
    Cross Examination By Mr. González-Delgado........37
    Cross Examination By Ms. Lizarribar-Masini.......61
    Redirect Examination By Mr. Acevedo-Hernández....93


OFFICER ALEJANDRO ESTRADA-DEIDA
    Direct Examination By Mr. Acevedo-Hernández.....100


DANIEL CABRERO
    Direct Examination By Mr. Acevedo-Hernández.....108
    Cross Examination By Mr. González-Delgado.......115

MIGUEL ÁLVAREZ-MEDINA
    Direct Examination By Mr. Acevedo-Hernández.....117
    Voir Dire Examination By Mr. Acevedo-Hernández..165
    Voir Dire Examination By Ms. Hill-Adames........166


Exhibits Admitted:  Government's 22, 23, 7-A, 12-A,
16-A, 16-B.

---

1      THE COURTROOM DEPUTY:  All rise.

2          (The Court enters the room.)

3      THE COURTROOM DEPUTY:  The United States

4  District Court for the District of Puerto Rico is now

5  in session.  All those having business before this

6  Court shall draw near, give your attention, and you

7  shall be heard.  God save the United States of

8  America and this Honorable Court.  Honorable Judge

9  Timothy Hillman presiding.

10         (The Jury enters the room.)

11     THE COURT:  Good morning, has anybody had

12  any difficulty following my instructions not to

13  discuss the case with anyone including with each

14  other?  Has anybody seen or read or overheard

15  anything touching on the case?  And, finally, is

16  there anything bearing upon your jury service you

17  wish to bring to my attention?  I will note there

18  were no affirmative responses.

19         All right.  Mr. Cruz-Santos, I'm going to

20  remind you you're still under oath.

21     THE WITNESS:  Yes.

22     THE COURT:  Ms. Hill, you may continue.

23     MS. HILL-ADAMES:  Good morning, Your Honor.

24     THE COURT:  Good morning.

25     MS. HILL-ADAMES:  May it please the Court.

1          Good morning, members of the jury.

2          Good morning Mr. Cruz-Santos.

3                              ---

4          ALEX MIGUEL CRUZ-SANTOS, a witness called on

5     behalf of the Government, having been previously duly

6     sworn by the Courtroom Deputy, was further examined

7     and testified as follows:

8                        CROSS EXAMINATION

9                              ---

10    BY MS. HILL-ADAMES:

11    Q.        Picking up where we left off Friday

12    afternoon, you agree with me that you arrived in the

13    prison more or less in 1993, correct?

14    A.        Correct.

15    Q.        And you also agree with me that inside the

16    prisons there's different prison groups?

17    A.        There's different groups.  They're separate

18    but, yes, they're different groups.

19    Q.        And among those prison groups you have the

20    Ñetas?

21    A.        Ñetas.

22    Q.        You have the 25s?

23    A.        The 25s.

24    Q.        25s are the ones that are also known as the

25    *Insectos*?

Alex Miguel Cruz-Santos - Cross

1  A.        They're a group and they're not known as the

2  *Insectos*.

3  Q.        You have the 27s?

4  A.        27s.

5  Q.        And the 27s known as the Insectos?

6  A.        I don't recognize them as the *Insectos*, I

7  recognize them as a group.

8  Q.        Is there a group that you know that goes by

9  the name or nickname of Insectos?

10 A.        What happens is that inside the prison

11 population there's people that commit acts of rape,

12 they're snitches, they make violet acts, so there's

13 no group that accepts them and they're kept isolated.

14 Prisons have modules that are just for those people.

15 And there's group that they accept people, but they

16 study the crimes to see how the crime originally

17 occurred to see if the person really has to do with

18 that crime.

19 Q.        And there's also a group that goes by the

20 name of 31s?

21 A.        The 31s.

22 Q.        And there's also another group, if you call

23 it that, that are the inmates that are neutrals that

24 don't belong to any group, correct?

25 A.        Yes, there's groups of people that are

Alex Miguel Cruz-Santos - Cross

1   neutral that don't belong to any group that they're

2   pretrial detainees and that they prefer to not be

3   under the rules and norms of any group, that they

4   prefer to be on their own.

5   Q.        And you will agree with me that a problem

6   with being a neutral is that within the prison then

7   you don't really have a group that stands up for you

8   or protects you if you're a neutral?

9           MR. ACEVEDO-HERNÁNDEZ:  Argumentative, Your

10  Honor.

11          THE COURT:  Overruled.  You may answer.

12  A.        Yes.  Well, if you're neutral then the thing

13  is that you don't go really into any prison in which

14  the Ñeta, the 27s, the 31s or the 25s are the ones

15  who govern, you go to a security module; because if

16  you go to into prison and you're going into a group

17  you have to go through a process and you have to

18  present -- you have to submit your complaint and they

19  study the complaint, and the group through which

20  process you have to go through analyzes why you want

21  to belong to that group.  And you have to live by

22  certain norms and rules and if you break those rules

23  then you're going to have situations, you're going to

24  have clashes.

25  BY MS. HILL-ADAMES:

8

Alex Miguel Cruz-Santos - Cross

1  Q.       So as a neutral it would be very difficult

2  to live inside a prison, right?

3          MR. ACEVEDO-HERNÁNDEZ:  Objection.

4  Misstates, the testimony, Your Honor.

5          THE COURT:  Sustained.

6  BY MS. HILL-ADAMES:

7  Q.       Would it be difficult as a neutral to live

8  inside a prison in Puerto Rico?

9          MR. ACEVEDO-HERNÁNDEZ:  Objection, Your

10 Honor, again.

11          THE COURT:  I think you've made your point.

12 Sustained.

13          MS. HILL-ADAMES:  Yes, Your Honor.  Your

14 Honor, may we approach briefly.

15          THE COURT:  You may.

16          (Sidebar discussions begin.)

17          MS. HILL-ADAMES:  Your Honor, I don't want

18 to argue with him but, you know, it's a yes-or-no

19 question.  And he's just most of the time

20 nonresponsive so, you know, I would like the Court to

21 instruct him.

22          THE COURT:  So I will say that that has been

23 the rule not the exception with this witness.

24          MS. HILL-ADAMES:  Yes.

25          THE COURT:  All right, I'll give him an

EVILYS E. CARRIÓN-ESQUILÍN, RPR
OFFICIAL COURT REPORTER FOR THE U.S. DISTRICT COURT OF PUERTO RICO
(787)772-3377

Alex Miguel Cruz-Santos - Cross

1    instruction.

2              MS. HILL-ADAMES:  Thank you, Your Honor.

3              THE COURT:  Thank you.

4              MR. ACEVEDO-HERNÁNDEZ:  But some of these

5    questions -- if I may add, some of these questions

6    are not really yes or no.  I was a neutral, well,

7    he's got to explain; it's not going to be yes, no.

8              MS. HILL-ADAMES:  Some are not but most are

9    and he doesn't respond to the question.

10             (Sidebar discussions end.)

11             THE COURT:  Mr. Cruz, I'm going to ask you

12   to, if you would please listen carefully to Counsel's

13   questions and if you can please answer the question

14   directly in the form in which it's asked.  And if you

15   cannot answer the question directly please say so and

16   I will have Counsel rephrase.  Okay?

17             THE WITNESS:  Okay.

18   BY MS. HILL-ADAMES:

19   Q.        So when you arrived in prison you decided to

20   join the Ñeta group, correct?

21   A.        Yes.

22   Q.        And you did this by choice?

23   A.        I chose to do that.

24   Q.        And you agree with me that the Ñetas have

25   certain rules or have rules?

Alex Miguel Cruz-Santos - Cross

1  A.         They have rules.

2  Q.         And amongst those rules one of them is no

3  stealing.

4  A.         There's no stealing.

5  Q.         Not looking at your fellow inmate as a girl.

6  A.         Yes.

7  Q.         No murder for hire.

8  A.         Yes.

9  Q.         No causing trouble.

10 A.         Yes.

11 Q.         Respect your mother and your father.

12 A.         Yes.

13 Q.         Not look at your fellow inmate's visitors?

14 A.         Yes.

15 Q.         Do not abuse addicts.

16 A.         Yes.

17 Q.         Do not abuse the weak.

18 A.         Also.

19 Q.         Respect the shout of the 30th of every

20 month?

21 A.         Yes, the 30th.

22 Q.         What does the word Ñeta stand for?

23 A.         Well, the Ñeta that's a -- it's like a war

24 cry.  It's a yell that's for unity, it's pleasure,

25 it's anger, it's mostly -- it's unity and it's a war

Alex Miguel Cruz-Santos - Cross

1  cry.

2  Q.        Amongst the other rules is no child abusers

3  among the group.

4  A.        Yes.

5  Q.        No rapists.

6  A.        No rapists.

7  Q.        And no inmates that are convicted of

8  domestic violence.

9  A.        Now they're being accepted.  Law 54 they're

10 now being accepted in the Ñeta group, as long as it's

11 not in front of a minor.

12 Q.        Okay.  So, Mr. Cruz-Santos, you would agree

13 with me that from what you know from being in the

14 prison system for 25 years the Ñeta group came about

15 from the terrible inhumane prison conditions that

16 were being lived by the inmates.

17 A.        No.

18 Q.        Are you saying that the Ñeta group was not

19 born in the early 1980s out of the abuses that the

20 inmates were suffering from the Department of

21 Corrections?  Is that your testimony?

22 A.        Yes, because of abuses from the Department

23 of Corrections but also there existed rivalries

24 between two groups, two masses, and one of the groups

25 did one thing and the other group did other things.

Alex Miguel Cruz-Santos - Cross

1    And when one inmate, Carlos Torres-Iriarte, didn't

2    agree with what was happening he decided, and some of

3    the other inmates they decided, that if they

4    continued -- people continued with that attitude that

5    they were going to act.

6         And what happened was that they faced each

7    other, they faced each other in war, and there were

8    some deaths.  And in some of the groups that there

9    were some deaths they ran to the officers and there

10   was war between them, and that's when the corrections

11   administration started to take that seriously and

12   that's when they started to divide the groups.

13        And after this, after they're divided, so

14   that they don't continue killing each other that's

15   when the Ñeta association is born.  And that scream

16   on the 30th that the Ñeta population does is in the

17   memory of Carlos Torres-Iriarte and it clarifies that

18   it's for all the fallen brothers in pain.

19   Q.      Sir, do you remember testifying before the

20   grand jury in this case?

21   A.      Can you repeat it.

22   Q.      Do you remember testifying before a grand

23   jury in this case?

24   A.      Yes.

25   Q.      And do you remember that a question was

Alex Miguel Cruz-Santos - Cross

1   posed to you and the question was, What was La

2   Asociación Ñeta about?

3   A.        Yes.

4   Q.        And the answer you gave, Well by, that time

5   it was a group that was devoted to assisting the weak

6   and to fight for the inmate's rights against the

7   abuse of the administration of corrections, yes or

8   no?

9   A.        Yes.  But the weak --

10  Q.        Yes or no?

11  A.        Yes.

12  Q.        Are you familiar with the massacre of Oso

13  Blanco in 1994?

14  A.        '94?

15  Q.        Yes.

16  A.        In '94, I was in the Green Monster, I wasn't

17  there.

18  Q.        But as an inmate are you familiar with the

19  massacre of Oso Blanco in 1994?

20  A.        No.

21  Q.        You're not aware of what happened?

22  A.        Well, what happened, what occurred at that

23  time I wasn't in prison at that time.  But --

24  Q.        Sir, you were not in prison in 1994?

25  A.        In Oso Blanco?  In '94, like I said, I was

Alex Miguel Cruz-Santos - Cross

1    in prison in the Green Monster.

2    Q.       That's not my question.  My question is, if

3    you were familiar with the massacre that occurred in

4    Oso Blanco in 1994?

5    A.       No.  I said no.

6    Q.       All right.  Let's move on.

7             Sir, you would agree with me that among the

8    things that happen on an everyday basis when you are

9    in a Puerto Rico local prison is that sometimes

10   there's a lack of quality in your living conditions,

11   correct?

12            MR. ACEVEDO-HERNÁNDEZ:  Objection, Your

13   Honor, relevance.

14            THE COURT:  Overruled.

15   A.       That's always existed.

16   BY MS. HILL-ADAMES:

17   Q.       Let's talk about that.

18            Give me an example of the lack of living

19   conditions in a prison cell.

20            MR. ACEVEDO-HERNÁNDEZ:  Objection, Your

21   Honor, relevance.

22            THE COURT:  I'll give you a little bit of

23   latitude here, but let's loop it in.

24   A.       Well, you have incomplete foods, there's a

25   lack of social workers, and the medical area that

Alex Miguel Cruz-Santos - Cross

1   doesn't comply with its requirements.

2   Q.      Is there sometimes spreads of diseases?

3   A.      Well, there's the spread of the diseases

4   among the population that use -- that are users and

5   they use the same syringes.  And there's rules in the

6   Ñeta organization to avoid that spread of diseases

7   when they're going to be shooting and they share

8   needles.

9   Q.      Are you aware of during your 25 years in

10  prison when there's been tuberculosis?

11          MR. ACEVEDO-HERNÁNDEZ:  Objection,

12  relevance, Your Honor.

13          THE COURT:  Sustained.

14  Q.      Are you aware where there's been spreads of

15  Dengue, Chikungunya, stomach viruses?

16          MR. ACEVEDO-HERNÁNDEZ:  Relevance, Your

17  Honor.

18          THE COURT:  I'm going to ask you to tie this

19  in.

20          MS. HILL-ADAMES:  Yes, Your Honor, I'll move

21  on.

22  BY MS. HILL-ADAMES:

23  Q.      So you know my client Giordano Santana,

24  correct?

25  A.      Yes, I know him.

Alex Miguel Cruz-Santos - Cross

1    Q.       And you know that he's been in prison for

2    over 40 years, correct?

3    A.       Yes, I know.

4    Q.       And there was a time during when you were in

5    prison that you coincided with him in the same

6    prison, correct?

7    A.       Two prisons.

8    Q.       Which ones were those?

9    A.       Ponce 1000 in Ponce, 2007.  In the same

10   module that I lived, I lived there with him and

11   that's the first time that I met him.  And later when

12   I go into minimum custody that I go into Phase 1

13   after several years then he's in there, in that

14   prison.

15   Q.       Okay.  And he was introduced to you back in

16   2007 as one of the older inmates.

17   A.       Older and respected and one of the pillars,

18   that he was there when things began in the battles.

19   Q.       And you stated here that Giordano was like a

20   dad to you, correct, yes or no?

21   A.       Yes.

22   Q.       All right.  And that you've also testified

23   that because of his seniority because of all the time

24   that he's been in prison he received a drug pension,

25   yes or no?

Alex Miguel Cruz-Santos - Cross

1   A.      It was an order from the maximum leadership,

2   yes.

3   Q.      Right.  And you were also told to make sure

4   that he had his commissary, his personal hygiene

5   items, correct, yes or no?

6   A.      Yes.

7   Q.      And you personally, when you were in prison

8   with him, were in charge of giving him his daily

9   heroin drug dose, correct, yes or no?

10  A.      It was an order.

11  Q.      Yes or no?

12  A.      It was an order -- yes.

13  Q.      And this drug dose was given twice a day,

14  yes or no?

15  A.      Twice a day.

16  Q.      And your testimony was that it was given in

17  a restricted manner, correct, yes or no?

18  A.      Yes.

19  Q.      And because if you didn't give him a

20  restricted doses he would probably overdose, correct?

21  A.      No.

22  Q.      Yes or no?

23  A.      No.  No.

24  Q.      Would you agree with me that Giordano was a

25  heroin addict?

Alex Miguel Cruz-Santos - Cross

1   A.        He was an addict of heroin because he

2   himself decided.

3   Q.        Sir, my questions are yes or no.

4   A.        Yes.

5   Q.        Okay.  Would you agree with me that Giordano

6   was a heroin junkie, yes or no?

7   A.        Yes, he was a heroin addict.

8   Q.        Would you agree with me that not all Ñeta

9   members use drugs?

10  A.        Not all of them use drugs.

11  Q.        Would you also agree with me that not all

12  Ñeta members sell drugs, yes or no?

13  A.        Yes, not all of them.

14  Q.        As a matter of fact, drugs are sold and

15  brought in sometimes by Department of Corrections

16  guards, yes or no?

17  A.        Yes.  A part of it, yes.

18  Q.        By some civilian employees?

19  A.        Some civil employees.

20  Q.        Some nurses?

21  A.        Also.

22  Q.        And there's also other groups in prison that

23  sell drugs as well, correct, yes or no?

24  A.        I can't say yes because I don't belong to

25  those groups.  I belong to the Ñeta organization, so

Alex Miguel Cruz-Santos - Cross

1    I know what happens in the Ñeta organization.

2    Q.       Can you say on your experience of being

3    25 years in prison?

4    A.       Based on my experience in prison, everything

5    exists in prison.  But I'm in the Ñeta group.

6    Q.       Sir, would you agree with me that when a

7    person is high on heroin, from your experience and

8    your perception, this creates changes in the person's

9    thoughts and feelings?

10            MR. ACEVEDO-HERNÁNDEZ:  Objection, Your

11   Honor.

12            THE COURT:  Sustained.

13   BY MS. HILL-ADAMES:

14   Q.       How would you describe a person who's high

15   on heroin?

16            MR. ACEVEDO-HERNÁNDEZ:  Objection, Your

17   Honor.

18            THE COURT:  Sustained.

19   BY MS. HILL-ADAMES:

20   Q.       Would you agree with me that they disconnect

21   from those around you?

22            MR. ACEVEDO-HERNÁNDEZ:  Objection again,

23   Your Honor.

24            THE COURT:  Sustained.

25   BY MS. HILL-ADAMES:

Alex Miguel Cruz-Santos - Cross

1   Q.        Were you in charge of preparing the heroin

2   table inside the prison at any point?

3   A.        At some point, yes.

4   Q.        And when you prepared the heroin decks or

5   the baggies, is it not a fact that sometimes you

6   would ask Giordano to try the quality of the heroin,

7   yes or no?

8   A.        There were people already there that existed

9   that they tried the drugs.  The drug that was given

10  to Giordano in the institution had already been

11  tested.  And when the drug comes into the prison

12  there's two persons that are called the testers, and

13  they check the quality to make sure that it's worth

14  the $10.

15  Q.        Sir, you would agree with me that whatever

16  pension or donation that was set out for Giordano as

17  an old prisoner it was consumed by drugs by him, yes

18  or no?

19  A.        Yes.

20          MS. HILL-ADAMES:  That would be all, Your

21  Honor.

22          MR. ACEVEDO-HERNÁNDEZ:  Your Honor, may I

23  approach before the next cross?

24          THE COURT:  Are you done?

25          MS. HILL-ADAMES:  Yes, Your Honor.

Alex Miguel Cruz-Santos - Cross

1          THE COURT:  Please.

2          (Sidebar discussions begin.)

3          MR. ACEVEDO-HERNÁNDEZ:  Your Honor, during

4     cross, Ms. Anita Hill's, cross --

5          THE COURT:  Quietly.

6          MR. ACEVEDO-HERNÁNDEZ:  During Anita Hill's

7     cross she asked questions about the origins of the

8     Ñeta organization, questions that elicited testimony

9     about battles.

10         MS. HILL-ADAMES:  No.

11         MR. ACEVEDO-HERNÁNDEZ:  Excuse me.  The

12    witness, and we can go to the record, testified as to

13    battles and how that was an integral part of the

14    formation of the organization, and that her client

15    had been there since the origin.  We submit to the

16    Court that Ms. Hill has opened the door for that

17    404(b) evidence that the Court excluded initially in

18    our case in chief by eliciting that testimony during

19    cross-examination, so we ask the Court's permission

20    on redirect to ask the witness to clarify whether in

21    fact her client, during those battles, had an active

22    role and has any knowledge as to his participation in

23    murders in those initial origins and stages of the

24    organization.

25         THE COURT:  Thank you.  It's denied.

Alex Miguel Cruz-Santos - Cross

1        (Sidebar discussions end.)

2        THE COURT:  Mr. Vélez, on behalf of

3    Mr. Rivera-Calcaño.

4        MR. VÉLEZ-GOVEO:  Good morning Your, Honor.

5    May it please the Court.

6                CROSS EXAMINATION CONTINUED

7                        ---

8    BY MR. VÉLEZ-GOVEO:

9    Q.      Good morning, sir.

10   A.      Good morning.

11   Q.      During your testimony last Friday at a

12   certain time you indicated on being questioned by the

13   government -- strike that -- being questioned by

14   sister counsel that in this business that you were

15   cooperating with the government nothing is for sure.

16   A.      There's nothing that's for sure because

17   here --

18   Q.      If I ask you for an explanation I will do

19   that.

20           You further said that nothing, no one does

21   anything voluntarily.

22   A.      Yes.  Yes.

23   Q.      Do you remember your testimony?

24   A.      Yes.

25   Q.      And, sir, I ask you, in preparation for your

Alex Miguel Cruz-Santos - Cross

1    testimony during this trial, did you meet with the

2    government several occasions, yes or no?

3    A.      Yes.

4    Q.      Multiple occasions.

5    A.      One or other occasions, yes.

6    Q.      And you were assisted by counsel.

7    A.      Yes.

8    Q.      And your counsel advised you.

9    A.      He would go, yes.

10   Q.      And --

11   A.      He would talk to me about the normal

12   processes, yes, the representation that he was going

13   to do with me.

14   Q.      And he also talked to you about the terms

15   and conditions of your agreement, did he not?

16   A.      Yeah, he explained to me the plea, the

17   sentence of the plea.

18   Q.      And based on those explanations that your

19   attorney told you, you want to make sure that you do

20   the right thing in order to get your end of the deal

21   during your testimony.

22           MR. ACEVEDO-HERNÁNDEZ:  Objection,

23   argumentative, Your Honor.

24           THE COURT:  Overruled.

25   A.      Well, I signed the cooperation plea.

Alex Miguel Cruz-Santos - Cross

1  BY MR. VÉLEZ-GOVEO

2  Q.      But you want something in return, don't you?

3  A.      In my mind, yes, of course.  I want them to

4  help me, yes.

5  Q.      And as part of that help you hope that

6  you're able to see your family, right?

7  A.      At some point on some day I would like to

8  see them, yes.

9  Q.      And reunite with them, yes?

10  A.      At some point, yes, that's what I would

11  want.

12  Q.      Is your mother still alive?

13  A.      Thank God she's alive.

14  Q.      And you love her.

15  A.      Yes, I love her.

16  Q.      You have children?

17  A.      I have children.

18  Q.      And you miss them.

19  A.      Yes.

20  Q.      Twenty-five years in jail, right?

21  A.      Twenty-five years in prison.

22  Q.      You want to make sure you get your end of

23  the deal.

24          MR. ACEVEDO-HERNÁNDEZ:  Argumentative, Your

25  Honor, misstates the evidence.  What deal?

Alex Miguel Cruz-Santos - Cross

1    THE COURT:  Sustained.

2  BY MR. VÉLEZ-GOVEO

3  Q.       You want to make sure you get, as part of

4  your testimony on behalf of the government, a

5  benefit, yes or no?

6  A.       There's nothing for sure.

7  Q.       You want to make it sure, right?

8  A.       I would try.

9  Q.       Ten minutes ago during your testimony being

10  cross-examined by sister counsel you stated that

11  initially the Ñetas it was created in order to

12  further the coexistence between the inmates that are

13  in the prison jail -- that are in the prison system.

14  A.       Yes.

15  Q.       As part of your testimony you have

16  identified Cynthia "La Cana," right?

17  A.       Cynthia González-Landrau, she's La Cana.

18  Q.       And you have testified that Cynthia is a

19  speaker for the Ñetas?

20  A.       Yes, she's a speaker because she's in the

21  free community.  She's the one that takes the message

22  to the secretary of corrections of any situation.

23  Q.       Either by speaking or meeting with the

24  secretary of corrections, right?

25  A.       Yes, correct.

Alex Miguel Cruz-Santos - Cross

1    Q.        And address problems with jail conditions.

2    A.        The ones that are given to her she takes to

3    the secretary and the secretary then tends to

4    whatever can arise.

5    Q.        She also spoke about medical problems within

6    the institution.

7    A.        Yes.

8    Q.        Problems with probation officers.

9    A.        Yes.

10   Q.        Problems with food supply.  You even

11   mentioned a company by the name of Trinity.

12   A.        Yes.

13   Q.        Abuse by police officers.

14   A.        There have been abuses by police officers.

15   Q.        That's not my question.

16            My question is, as part of Cynthia being a

17   speaker has she addressed, to your knowledge,

18   concerns about abuse by police officers to inmates,

19   based on your knowledge?

20   A.        No.

21   Q.        Has Cynthia addressed problems by illegal

22   searches with the secretary of corrections?

23   A.        No.

24   Q.        Sir, I ask you, within the members of the

25   Ñeta organization you have drug sellers.

Alex Miguel Cruz-Santos - Cross

1    A.        Within the organization, yes, you have

2    people who have the organization's trust who tend to

3    that type of business.

4    Q.        And you said there are testers or

5    *probadores*?

6    A.        In the chapters that are associated to the

7    Ñetas there's a rule that there has to be testers,

8    that these testers have to test the drugs to make

9    sure that the quality is good.  If the quality is bad

10   then that drug has to be taken out and cannot be

11   given to the population.

12   Q.        And that's important to set the price of the

13   drug.

14   A.        Well, that's stipulated by the maximum

15   leadership and the maximum leadership, well, they

16   have these norms, and leaders that they set up have

17   to follow it as it is.

18   Q.        Let me ask you to be responsive, yes or no.

19   My questions are simply yes or no most of them.

20             Testers are important to set the price of

21   the drugs; isn't that right?

22   A.        Yes.

23   Q.        And the testers, the *probadores*, they ought

24   to know the drug.

25   A.        There's inmates that come in from the free

Alex Miguel Cruz-Santos - Cross

1    community that are already addicts and so they come

2    into prison and they continue being addicts.

3    Q.       And so you identify a marijuana user and you

4    give them the marijuana to test the quality of the

5    marijuana.

6    A.       Yes.

7    Q.       You do the same thing with the cocaine user.

8    A.       It's not the same thing, it's not tested the

9    same.

10   Q.       But the person requires to know the cocaine.

11   A.       It's not required that they recognize it.

12   Q.       The high that the cocaine gives.

13   A.       It's different.

14   Q.       So the person must know about the kind of

15   high?

16   A.       They have to know it, yes, that's right.

17   Q.       And the heroin addict as well.

18   A.       Heroin and cocaine, that's right.

19   Q.       And, again, that's important in order to be

20   able to set the price on the different types of

21   drugs.

22   A.       Yes, so it's within the rules that the

23   organization establishes.  It has to be like that.

24            MR. VÉLEZ-GOVEO:  May I have a moment, Your

25   Honor.

Alex Miguel Cruz-Santos - Cross

1          (Defense counsel confer.)

2     Q.        I ask you, sir, within the members of the

3     Ñetas there were members that were *probadores* or

4     testers.

5          MR. ACEVEDO-HERNÁNDEZ:  Asked and answered,

6     Your Honor.

7          THE COURT:  Sustained.

8     BY MR. VÉLEZ-GOVEO

9     Q.        Sir, let me address your attention to what

10    you said about being a member of the Ñeta, the

11    qualifiers if you will.  In order to be a Ñeta member

12    you had to be someone respected, part of the

13    qualities of the members of the Ñetas.

14    A.        Well, to be a member of the Ñeta the crimes

15    that you had -- well, before you couldn't be a --

16    Q.        If I ask for an explanation --

17         MR. ACEVEDO-HERNÁNDEZ:  Your Honor,

18    objection.  That was an open-ended question that he

19    posed.

20         THE COURT:  Well, the answer was

21    nonresponsive, so let's try it again.

22    BY MR. VÉLEZ-GOVEO

23    Q.        As part of the qualifiers to be a member of

24    the group Ñeta the member had to be within the -- the

25    qualities a person must possess to be a respected

Alex Miguel Cruz-Santos - Cross

1    person within the organization.

2    A.       No.

3    Q.       Someone reliable.

4    A.       Well, to be in the organization of the Ñetas

5    you have to have certain crimes.  You have to have

6    killed a police officer, robbed a bank, you have to

7    have been one of the kingpins selling drugs, or

8    having gone to a house to steal.  I mean, there's

9    certain crimes in order to qualify.  You can't have

10   been a snitch, you can't have raped a girl.

11   Q.       That's right, you can't have a snitch as a

12   Ñeta member.  I just want to make sure that I

13   understood you.

14   A.       You can't be a snitch.

15   Q.       Well, you said you were a leader within the

16   organization, were you not?

17   A.       Yes, I was a leader in the organization.

18   Q.       And during that time you had to deal with

19   several snitches, didn't you?

20   A.       They wouldn't reach the population because

21   the correction officers they have the control that

22   when they arrive --

23            MR. VÉLEZ-GOVEO:  Your Honor --

24   A.       There's people that exist that are in the

25   institution --

Alex Miguel Cruz-Santos - Cross

1      MR. VÉLEZ-GOVEO:  I'm going to ask Your

2    Honor to instruct the witness to be responsive.

3           THE COURT:  Mr. Cruz-Santos, please listen

4    carefully to the lawyer's questions and if you can

5    answer them in the form that they're asked, please

6    do.  And if you can't answer them, just tell me and

7    I'll ask to rephrase.

8           THE WITNESS:  Okay.

9           THE COURT:  Try it again.

10   BY MR. VÉLEZ-GOVEO:

11   Q.      During the time that you were a leader did

12   you have to deal with snitches?

13   A.      Yes.

14   Q.      And as part of your dealing with the *chotas*

15   you sent them away, didn't you?

16   A.      I wouldn't send them away.

17   Q.      But you had the authority and the means to

18   be able to transfer an inmate to a different

19   location.

20   A.      No.

21   Q.      Special housing unit, were you able to set

22   them in special housing units?

23   A.      No.

24   Q.      Did you let them take over your role as a

25   leader?

Alex Miguel Cruz-Santos - Cross

1    A.        No.  When I find --

2    Q.        That's fine.

3              So you kept the control, you maintained the

4    control?

5    A.        No.  I had to report the situation to the

6    maximum leadership.  When you find the snitch you

7    have to call the maximum leadership, *Papito Machuca*,

8    Cigueña, Bambani, and let them know about what's

9    happening in that situation.  They meet and they call

10   you on your cell phone and, being the leader, you

11   explain to them the situation that you have with that

12   inmate, and they make a determination over there, an

13   internal determination, if they deserve death or to

14   lock them up.  If they decide to lock him up, then,

15   as leader, I notify the sergeant or the

16   superintendent who's on shift, on duty, that there's

17   problems with this inmate.

18             The sergeant, lieutenant, superintendent,

19   they take care of the matter, they get him out of the

20   institution.  And the process they have with them is

21   to take them to a security module.  That's how that

22   operates.

23   Q.        So you were able to deal with different

24   situations, with different snitches just the way you

25   explained?

Alex Miguel Cruz-Santos - Cross

1   A.        Well, different ones, yes, and other cases

2   too.

3   Q.        There were different institutions where you

4   had been.

5   A.        In many institutions.

6   Q.        Has Zarzal been one of them?

7   A.        No.

8   Q.        During your testimony last week, Thursday if

9   I'm not mistaken, you did say that you were

10  conscience or you knew that there were no drugs in

11  Zarzal; do you remember that?

12          MR. ACEVEDO-HERNÁNDEZ:  Objection, Your

13  Honor.  That's misstating the evidence.

14          THE COURT:  Sustained.  I'll let you go

15  there but rephrase please.

16  BY MR. VÉLEZ-GOVEO:

17  Q.        Are you aware of any drugs personally?

18  Personal knowledge, I'm asking you personal

19  knowledge.  Are you aware of any drugs in the Zarzal

20  institution?

21  A.        Yes, in Zarzal.

22  Q.        So you're stating today, contrary to what

23  you stated before --

24          MR. ACEVEDO-HERNÁNDEZ:  Objection,

25  argumentative.

Alex Miguel Cruz-Santos - Cross

1      THE COURT:  Sustained.

2   BY MR. VÉLEZ-GOVEO:

3   Q.      Sir, I ask you how long have you been -- how

4   much time have you spent in Zarzal?

5      MR. ACEVEDO-HERNÁNDEZ:  Objection, Your

6   Honor.

7      THE COURT:  Overruled.

8   A.      None.  None.

9   BY MR. VÉLEZ-GOVEO

10  Q.      Never.

11         Briefly I'm going to address your attention

12  what you designated or called as "Western."  Do you

13  remember that?

14  A.      Yes, the Western Unions.

15  Q.      Isn't it true that the Western was used to

16  pay cigarettes?

17  A.      Not cigarettes.

18  Q.      Canned foods?

19  A.      No.

20  Q.      Commissary?

21  A.      No.

22  Q.      Cell phones?

23  A.      Cell phones.

24  Q.      TVs?

25  A.      Yes.

Alex Miguel Cruz-Santos - Cross

1    Q.         PlayStations?

2    A.         No.

3    Q.         Hygiene material?

4    A.         No.

5    Q.         You said during your testimony that upon

6    being questioned by the government that you know

7    Miguel Rivera-Calcaño.

8    A.         Not personally.

9    Q.         At some point you were called by someone, by

10   a third party, and told you that you were going to

11   receive a call from Miguel Rivera-Calcaño.

12   A.         What happens is that --

13   Q.         Yes or no?

14   A.         No.

15   Q.         You were never called by anyone that you

16   were going to receive a call by Miguel

17   Rivera-Calcaño?

18   A.         Yes.

19   Q.         Do you remember your testimony during the

20   first trial back in 2007 -- in 2017 -- strike that --

21   in 2017 when you were asked, Who initially called you

22   to give you the heads-up that Miguel Rivera-Calcaño

23   was going to call you?

24            MR. ACEVEDO-HERNÁNDEZ:  Objection.  He

25   hasn't laid a foundation for any inconsistent

Alex Miguel Cruz-Santos - Cross

1    statement, so it's improper impeachment Your, Honor.

2         THE COURT:  Overruled.

3    A.       Yes, what happens is that --

4    BY MR. VÉLEZ-GOVEO

5    Q.       Yes or no?

6    A.       Yes.

7    Q.       And you remember that the person that you

8    stated back then the name that you gave was Fernan

9    Sandwich?

10   A.       Yes.

11   Q.       And you remember that during your testimony

12   now during this trial that you said that the person

13   that called you to tell you that you were going to

14   receive a call by Miguel Rivera-Calcaño was Cigueña?

15   A.       Cigueña.  What happens is that --

16   Q.       Yes or no?

17   A.       Well --

18   Q.       I'm not asking for an explanation.

19   A.       Yes.  Yes.

20   Q.       And Fernan Sandwich and Cigueña are two

21   different people.

22   A.       Yes, different ones.

23   Q.       And I ask you, sir, have you ever seen

24   physically Miguel Rivera-Calcaño?

25        MR. ACEVEDO-HERNÁNDEZ:  Asked and answered,

Alex Miguel Cruz-Santos - Cross

1    Your Honor.

2    A.       I always said that no.

3            MR. VÉLEZ-GOVEO:  I have no further

4    questions with the witness, Your Honor.

5            THE COURT:  Attorney González on behalf of

6    Casado-Berrios.

7            MR. GONZÁLEZ-DELGADO:  Yes, Your Honor.

8            Good morning.

9            THE COURT:  Good morning.

10                  CROSS EXAMINATION CONTINUED

11                            ---

12   BY MR. GONZÁLEZ-DELGADO:

13   Q.       Mr. Cruz, you stated that you've never been

14   in Zarzal, correct?

15   A.       No.

16   Q.       Do you know that Mr. Roberto Casado-Berrios

17   has been in Zarzal since 2007?

18   A.       Yes.

19   Q.       Okay.  Now, you say that in 1994 you were in

20   Monstruo Verde, the translation is Green Monster,

21   which is the maximum security prison in Ponce; is

22   that correct?

23           THE INTERPRETER:  The interpreter needs

24   repetition.

25   Q.       Yes.  That you stated before that in 1994

Alex Miguel Cruz-Santos - Cross

1    you were in Monstruo Verde, the Green Monster, the

2    maximum security prison in Ponce, Puerto Rico.

3           MR. ACEVEDO-HERNÁNDEZ:  Objection to the

4    translation.

5           THE INTERPRETER:  What year?

6           MR. GONZÁLEZ-DELGADO:  1994.

7    A.        In '94, October 7 is when I arrived to the

8    Green Monster.

9    Q.        And the truth is that you were never in the

10   same building as Mr. Roberto Casado-Berrios when you

11   were in maximum security in Ponce, correct?

12   A.        Not in the same module.

13   Q.        So you've never been in the same cell as

14   Mr. Casado-Berrios, correct?

15   A.        But we would spend time together in the

16   passage, in the hallways, and I would go to his

17   module and he would go to mine.

18   Q.        In a maximum security prison?

19   A.        We would spend time together during sports,

20   boxing, basketball, and also I would go to his module

21   and he would go to mine and we would talk and we

22   would see each other face-to-face.  And we were

23   persons that -- well, we really liked each other, and

24   that was in the Green Monster.  And I also went with

25   him to the administration to talk about some packages

Alex Miguel Cruz-Santos - Cross

1    that weren't coming through, they weren't coming

2    through to the population.

3    Q.       Isn't it true that in maximum security you

4    do not have permission to go out of your cell except

5    to take a bath and to maybe go to the doctor's

6    appointment?

7    A.       No.

8    Q.       So, you're telling the Ladies and Gentlemen

9    of the Jury that in maximum security, in a maximum

10   security prison known as Monstruo Verde in Ponce, you

11   have free access to all areas in the prison?

12   A.       Yes.

13   Q.       Now, didn't you state on Friday that in

14   maximum security prisons you only go out to take a

15   bath or to a medical appointment once the guards have

16   made sure that you have no quarrels or segregation

17   with other inmates?

18   A.       That's a security module.  In maximum

19   security prison where I was it would open from 6:00

20   to 6:00 because there were two inmates per cell and

21   some agreements were made with the Department of

22   Corrections because the cell was too small to have

23   two inmates.  So there the cells would open from 6:00

24   in the morning or 7:00-something in the morning and

25   they would be locked at 6:00 in the afternoon.

Alex Miguel Cruz-Santos - Cross

1      And that agreement was done with a good

2  behavior so that we could keep it like that from 6:00

3  to 6:00 and that way you could spend time together

4  and go into other modules but other modules that

5  belonged to the Ñeta Organization not that had to do

6  with other organizations.

7  Q.      Weren't you housed in Building C-5?

8  A.      In C-5.

9  Q.      And was it -- wasn't Mr. Casado-Berrios

10  housed in Building A-5?

11  A.      Yes.  They're right next to each other but

12  face-to-face.  It's one and then you have the hallway

13  and the other one's right in front of it.

14  Q.      But between these two buildings there's a --

15  there are four different gates in order for you to

16  get from one building to the other.

17  A.      And an elevator in between to be able to go

18  down.  You go to the gates and you say, Officer, I'm

19  going to A-5 and he opens the two gates and you go

20  over there.  That's how it was during the time that I

21  was living there with him.

22  Q.      So it's fair to say that you had free access

23  in a maximum security prison in Ponce, in 1994?

24  A.      Yes.

25  Q.      Okay.  Now, in this case or before this case

Alex Miguel Cruz-Santos - Cross

1    you said you started cooperating in 2012, correct?

2    A.       Mid.

3    Q.       Okay.  And the reason was because you were

4    caught with something illegal in jail, correct?

5    A.       Yes, with some chips.

6    Q.       And since that's illegal that had a serious

7    consequence on your possibilities for parole.

8    A.       Mostly, yes.

9    Q.       And because of this you did not want to have

10   that possibility -- not destroyed -- have that

11   possibility disappear is the reason why you decided

12   to cooperate.

13   A.       In the state court, yes.

14   Q.       Because if -- if you're in jail and they

15   catch you with something illegal state court takes

16   care of those cases; is that correct?

17   A.       If the case merits going to court then it

18   goes to court; if not, then it stays internally as a

19   complaint.

20   Q.       Okay.  And then you say that you told the

21   Department of Corrections that you were willing to

22   cooperate.

23   A.       Yes, to an officer.

24   Q.       And in exchange for that cooperation what

25   you wanted was not to have them process you for that

Alex Miguel Cruz-Santos - Cross

1  illegal chip that they had found on you; is that

2  correct?

3  A.      Yes.

4  Q.      But unfortunately the Department of

5  Corrections didn't comply with their part of the

6  deal.

7  A.      They didn't comply.

8  Q.      And then that's when you decide to go and

9  cooperate with the Federal Government.

10  A.      Yes.

11  Q.      Because you thought there were more serious

12  charges that were pending against you.

13  A.      I didn't know.

14  Q.      But you knew that the Department of

15  Corrections were pressuring you to provide more

16  serious or more detailed information as to what you

17  thought was illegally happening in these jails; is

18  that correct?

19  A.      They wanted stronger things and more

20  continuous.

21  Q.      But that information, from what you have

22  stated, was information that was dangerous to you as

23  a Ñeta member in jail, correct?

24  A.      Yes.

25  Q.      Okay, but on your first cooperation with the

Alex Miguel Cruz-Santos - Cross

1    Department of Corrections you personally requested

2    the Department of Corrections not to process you for

3    those chips that were found, is that correct, in

4    exchange for your cooperation.

5    A.        They processed me anyway.

6    Q.        That's not my question.

7              My question is --

8    A.        That was my idea.

9    Q.        And that was your request.

10   A.        Yes.

11   Q.        Okay.  And then you have the Federal

12   Government come in and try to have you as a witness;

13   is that correct?

14   A.        I arrived to the Federal Government.  I --

15   Q.        You called them?

16   A.        I made the approach.

17   Q.        Through an illegal cell phone in jail?

18   A.        Yes, to a corrections officer.

19   Q.        Either it's through an illegal cell phone

20   that you called the Feds or was it that you spoke

21   with a correctional officer to have the Feds come and

22   talk to you?

23   A.        Through a correctional officer.

24   Q.        Okay.  So you went to tell the Federal

25   Government that in exchange for my cooperation, I

Alex Miguel Cruz-Santos - Cross

1   want to get out of jail.

2   A.        No.

3   Q.        You just stated that, I just want to

4   cooperate, that's it.

5   A.        I wanted to talk, talk to them.

6   Q.        Nothing in exchange?

7   A.        They didn't know me and I didn't know them,

8   I just wanted to talk.

9   Q.        You wanted to sit down with them to

10  negotiate a plea agreement or a way of getting out of

11  jail; is that correct?

12  A.        First I wanted to talk to them to inform

13  them on the situation.

14  Q.        Because you did not want to stay in jail

15  anymore; is that correct?

16  A.        Well, that was what I was thinking.

17  Q.        And you expressly told the federal agent who

18  met with you that in exchange for your cooperation

19  you wanted to get out of jail; is that correct?

20        MR. ACEVEDO-HERNÁNDEZ:  Objection, Your

21  Honor, may I approach.

22        THE COURT:  Sure.

23        (Sidebar discussions begin.)

24        THE COURT:  I think if we ask

25  Mr. Cruz-Santos what time it was he'd tell us how to

Alex Miguel Cruz-Santos - Cross

1    build a watch.

2              MR. ACEVEDO-HERNÁNDEZ:  Your Honor, my

3    petition from the Court is that the way the defense

4    counsel is asking these questions it's as if he has a

5    good-faith basis that this in fact happened.  I, as

6    the prosecutor who has handled this investigation,

7    have no knowledge of this having happened, so I

8    request that defense counsel produce what is his

9    good-faith basis for questioning because the manner

10   he's questioning, he's giving the impression to the

11   jury that this in fact happened.  There's no

12   good-faith basis for these types of questions unless

13   he has something.

14             THE COURT:  All he's asking him is the basis

15   upon which he made his deal.  Why wouldn't that be

16   fair game?

17             MR. ACEVEDO-HERNÁNDEZ:  Because the way he's

18   asking it is in a manner like he in fact went to the

19   federal agent and requested a lower deal, a lower

20   sentence.  And we submit that he -- there has to be a

21   good-faith basis.  If he wants to ask an open-ended

22   question and he's not giving the impression that this

23   in fact happened we have no objection.

24             THE COURT:  If you ask this witness an

25   open-ended question we will be here into until

1    Christmas.

2            MR. ACEVEDO-HERNÁNDEZ:  I know, Your Honor,

3    but he doesn't have any good-faith basis for it

4    because --

5            Do you have any knowledge that he in fact

6    did that to Terri James?  because I don't and I was

7    the prosecutor in charge of this case.

8            THE COURT:  What do you want to say?

9            MR. GONZÁLEZ-DELGADO:  I'm asking him

10   questions and I'm working on the answers that he's

11   providing.

12           THE COURT:  Quietly please.  Do you have a

13   basis upon which this guy entered into these

14   negotiations?

15           MR. GONZÁLEZ-DELGADO:  Yes, his answers.

16   When he was on direct examination --

17           THE COURT:  In discovery or on your

18   investigation?

19           MR. GONZÁLEZ-DELGADO:  In my investigation?

20   Your Honor, his testimony last week he said no one

21   does anything for anybody.

22           THE COURT:  How much longer are you going to

23   be on this line of questioning?

24           MR. GONZÁLEZ-DELGADO:  May half an hour,

25   Your Honor.

Alex Miguel Cruz-Santos - Cross

1          THE COURT:  How much longer on this line of

2     questions?

3          MR. GONZÁLEZ-DELGADO:  It -- maybe five more

4     minutes, but I don't think --

5          THE COURT:  I'm going to -- I'll watch this

6     carefully but right now I'm going to let him continue

7     down this path.

8          MR. GONZÁLEZ-DELGADO:  Thank you.

9          THE COURT:  Thank you.

10         (Sidebar discussions end.)

11         MR. GONZÁLEZ-DELGADO:  If I may, Your Honor.

12         THE COURT:  Yes, please.

13    BY MR. GONZÁLEZ-DELGADO:

14    Q.        Mr. Cruz, when you met with the federal

15    agent to testify or to ask him to use you as a

16    witness -- a cooperator you had an idea in mind and

17    that idea was that you did not want to stay in jail

18    anymore; is that correct?

19    A.        Correct.

20    Q.        And the agent told you that she could not

21    promise you anything; is that correct?

22    A.        Correct.

23    Q.        And because it's the prosecutor who makes

24    the promises; is that correct?

25              MR. ACEVEDO-HERNÁNDEZ:  Objection, Your

Alex Miguel Cruz-Santos - Cross

1    Honor.

2            THE COURT:  Sustained.

3    BY MR. GONZÁLEZ-DELGADO:

4    Q.        Did the agent tell you that she had to go

5    over this with a prosecutor?

6    A.        The information, yes, the information.

7    Q.        Were you represented by counsel at this

8    meeting?

9    A.        With the prosecutor or with the federal

10   agent?

11   Q.        First with the agent.

12   A.        No.

13   Q.        Okay.  Then they told you that you were

14   going to meet with the prosecutor; is that correct?

15   A.        Correct.

16   Q.        Did you ask for legal counsel or was legal

17   counsel provided to you?

18   A.        At that moment I did not ask for legal

19   representation.

20   Q.        But in fact an attorney went to speak to you

21   related to that cooperation that you were willing to

22   give; is that correct?

23   A.        Afterwards.

24   Q.        After the meeting with the case agent or

25   after the meeting with the prosecutor?

Alex Miguel Cruz-Santos - Cross

1  A.        After the meeting with the prosecutor.

2  Q.        Okay.  And in that first meeting did you

3  provide the information that you were willing to give

4  to the prosecutor?

5  A.        I began to provide information.

6  Q.        Did you have a proffer letter at that moment

7  from the government?

8  A.        I didn't understand.

9  Q.        Okay.  You say that you met with the

10  prosecutor first -- I mean after you met with the

11  case agent; is that correct?

12  A.        Yes.

13  Q.        And in that first meeting you already stated

14  that you never had legal counsel at the time.

15  A.        No.

16  Q.        My question after was if you had a proffer

17  letter before you had legal counsel, from the

18  government?

19  A.        No.

20  Q.        So after that first meeting you were told

21  that you would have subsequent meetings with the

22  government; is that correct?

23  A.        Yes.

24  Q.        But at that time you were provided with

25  legal counsel.

Alex Miguel Cruz-Santos - Cross

1    A.       No.

2    Q.       When did you receive legal counsel for this

3    case, for your cooperation?

4    A.       When I was incarcerated in MDC, that's when

5    I had legal representation from an attorney.

6    Q.       And so you're telling the ladies and

7    gentlemen that for four years you provided

8    information to the government without any legal

9    representation?

10           MR. ACEVEDO-HERNÁNDEZ:  Misstating the

11   evidence, Your Honor.

12           THE COURT:  Sustained.

13   BY MR. GONZÁLEZ-DELGADO:

14   Q.       Okay.  You started cooperating in 2012,

15   correct?

16   A.       With the state jurisdiction in mid 2012 I

17   began to cooperate with Corrections at the state

18   level.

19   Q.       When did you start cooperating with -- what

20   year did you start cooperating with the Federal

21   Government?

22   A.       When I sat with the Federal Government with

23   a federal agent, I sat down face-to-face to talk,

24   that was in 2015.  To talk.

25   Q.       A year before you were indicted.

Alex Miguel Cruz-Santos - Cross

1    A.        A year before.

2    Q.        How many times did you meet with the

3    government before you were indicted?

4    A.        State level or federal?

5    Q.        Federal level.

6    A.        With the Feds that was in May that I -- I

7    can't really say the exact month but with the federal

8    agent.

9    Q.        My question is, how many times did you meet

10   with the Federal Government before you were indicted?

11   A.        Two or three times.

12   Q.        And in those meetings the prosecutor never

13   gave you an informal or a formal agreement, a

14   cooperation agreement?

15   A.        What I was given was a plea agreement and a

16   cooperation plea and the attorney gave it to me.  He

17   explained to me and regarding the documents --

18   Q.        Mr. Cruz.

19             MR. GONZÁLEZ-DELGADO:  I haven't posed my

20   question, Your Honor.

21             THE COURT:  We're going to take our break

22   right here.

23             So, ladies and gentlemen, we're going to

24   take a morning break and we will see you back here in

25   20 minutes.

Alex Miguel Cruz-Santos - Cross

1          (The Court and Jury exit the room.)

2          (Jury trial recessed at 10:30 a.m. and

3  resumed at 10:54 a.m.)

4          THE COURTROOM DEPUTY:  All rise.

5          (The Court enters the room.)

6          MR. ACEVEDO-HERNÁNDEZ:  Your Honor, may I be

7  heard on a matter.

8          THE COURT:  Quickly, please.

9          MR. ACEVEDO-HERNÁNDEZ:  I'm just

10  instructing from the Court an instruction to the

11  jury -- requesting an instruction to the jury as to

12  there's nothing improper with any of the parties

13  meeting with the witnesses in preparation; because

14  they're trying to make a big deal that the United

15  States met with the witnesses and there's an

16  instruction as to that.  I don't know if the Court

17  wants to wait and include that in the final

18  instructions.

19          THE COURT:  I was planning on putting it

20  into the final instruction.  Let's see how we do

21  here.  I didn't get that implication from that.  I

22  will look and see what happens with this as we move

23  forward.

24          THE BAILIFF:  All rise.

25          (The Jury enters the room.)

Alex Miguel Cruz-Santos - Cross

1        THE BAILIFF:  You may be seated.

2        MR. GONZÁLEZ-DELGADO:  May I.

3        THE COURT:  You may.

4   BY MR. GONZÁLEZ-DELGADO:

5   Q.        Okay, Mr. Cruz, your last statement was --

6   your last answer was that you only received the plea

7   and cooperation agreement in this case as a result of

8   your cooperation; is that correct?

9   A.        Yes.

10  Q.        You weren't promised that no state charges

11  would be filed against you?

12  A.        No state, no.

13  Q.        That no revocation proceedings were going to

14  be held against you.

15  A.        Revocation?  I don't understand.

16  Q.        Sorry.  Let me rephrase the question.

17        No promises were made that administrative

18  measures would be taken against you; is that correct?

19  A.        Administrative measures, no.

20  Q.        You weren't going to be punished for the

21  information that you were providing, is that right,

22  by the Department of Corrections?

23  A.        Yes, but they didn't comply.

24  Q.        I'm talking about after.  Once you're

25  already cooperating with the Federal Government, were

Alex Miguel Cruz-Santos - Cross

1    you promised that no administrative procedures would

2    be held against you if you provided information to

3    the government?

4    A.      It's just that there were no administrative

5    procedures.

6    Q.      But you were committing crimes in jail,

7    isn't that correct, at the time that you were

8    providing information to the government?

9    A.      Yes.

10   Q.      Okay.  And my question is, you were not

11   promised that you would not be processed for these

12   crimes that you were committing with the government's

13   knowledge?

14   A.      Yes, I'm here processed.

15   Q.      But that was the only -- the only thing that

16   they told you was that -- okay, let me rephrase the

17   question.

18           Were you told that you were going to be

19   processed and indicted as a Ñeta member for the

20   information that you were providing?

21   A.      That I was going to be charged.

22   Q.      And you were waiting for that?

23   A.      After a time, after we're talking and

24   everything that the attorney explained it to me, he

25   said, yes, that I was going to be charged.

Alex Miguel Cruz-Santos - Cross

1    MR. GONZÁLEZ-DELGADO:  There's a missing
2  translation there.  He said that --
3    MR. ACEVEDO-HERNÁNDEZ:  Objection.
4    MR. GONZÁLEZ-DELGADO:  It was before.
5    THE COURT:  Sustained.  Ask him to repeat
6  his answer.
7  Q.    Could you repeat the answer, please.
8  A.    Yes.  When the attorney talked to me and
9  after the whole process he said that, yes, that I was
10  going to be charged when he placed the plea in front
11  of me.
12  Q.    So you received the plea agreement before
13  you were charged.
14  A.    No, afterwards about two weeks that he
15  explained the plea to me in front of me, the two of
16  us facing each other.
17  Q.    But the truth is that you have nothing in
18  writing as to a promise that was made to you as --
19  not payment -- in exchange for your cooperation?
20  A.    Nothing written.  There was no type of
21  promise, I just signed the cooperation plea.
22  Q.    Just the plea supplement, correct?
23  A.    Yes.
24  Q.    Okay.  You weren't promised that you would
25  have a better classification in jail for your

Alex Miguel Cruz-Santos - Cross

1    cooperation?

2           MR. ACEVEDO-HERNÁNDEZ:  Your Honor,

3    objection.

4           THE COURT:  Sustained.

5    BY MR. GONZÁLEZ-DELGADO:

6    Q.      Were you told, were you verbally told, that

7    you would be released from jail if you cooperated in

8    this case?

9    A.      Never.

10   Q.      You're sure of that?

11   A.      I'm sure.

12   Q.      Never spoke with anybody that you were going

13   to be --

14          MR. ACEVEDO-HERNÁNDEZ:  Objection, Your

15   Honor.

16          THE COURT:  Let him finish the question,

17   please.

18   BY MR. GONZÁLEZ-DELGADO:

19   Q.      Did you ever speak with anybody and tell

20   them that you were going to be released from jail

21   because you were going to cooperate in this case?

22   A.      Well, no.

23   Q.      Were you paid any cash for the information

24   that you were providing?

25   A.      Never.

Alex Miguel Cruz-Santos - Cross

1   Q.      Were you paid in commissary in jail as part

2   of your cooperation agreement?

3   A.      Never.

4   Q.      Were you -- now, while you're cooperating

5   you were actually deceiving the Department of

6   Corrections; is that correct?

7           MR. ACEVEDO-HERNÁNDEZ:   Argumentative, Your

8   Honor.

9           THE COURT:  Sustained.

10  BY MR. GONZÁLEZ-DELGADO:

11  Q.      When you were cooperating you were

12  committing crimes that the Department of Corrections

13  had no idea you were committing; is that correct?

14  A.      The crimes that I committed at the

15  institution was because I was a leader and I received

16  instructions from the maximum leadership.  They knew

17  that I --

18  Q.      They knew that you hid from the Department

19  of Corrections.

20  A.      You have to hide them.

21  Q.      And at the same time you were hiding from

22  the Ñetas the fact that you were cooperating with the

23  Department of Corrections and the Federal Government.

24  A.      Yes.  I couldn't tell them that I was

25  cooperating.

Alex Miguel Cruz-Santos - Cross

1    Q.        So at the same time you were hiding

2    information from both Los Ñetas and from the

3    government.

4    A.        I didn't understand.

5    Q.        You were not telling the Department of

6    Corrections that you were dealing in drugs as part of

7    your Ñeta membership; is that correct?

8    A.        Yes.

9    Q.        Okay.  And you weren't telling the

10   government that you continue to participate as a Ñeta

11   member, is that correct, with your full

12   responsibilities, as you have stated in court?

13           MR. ACEVEDO-HERNÁNDEZ:  Your Honor,

14   objection.  Which government?

15           THE COURT:  Sustained.  I'll let you go

16   there just break it into small pieces, please.

17           MR. GONZÁLEZ-DELGADO:  Yes.

18   BY MR. GONZÁLEZ-DELGADO:

19   Q.        Did you hide from the Federal Government the

20   fact that you're continuing to be a Ñeta member with

21   full responsibilities as you have stated in your

22   testimony here?

23   A.        All the information I would give them,

24   everything that was required I would give to them.

25   All the information.

Alex Miguel Cruz-Santos - Cross

1   Q.        And from the state government did you

2   provide them that information also?

3   A.        I also gave information to the state

4   government.

5   Q.        Okay, you gave some information or all

6   information?

7           MR. ACEVEDO-HERNÁNDEZ:  Objection.  To whom?

8   It's not clear from the question, Your Honor.

9           MR. GONZÁLEZ-DELGADO:  To the state, that

10  was the follow-up question, Your Honor.

11          THE COURT:  Overruled.

12  A.        I would give information to the state

13  government, information that I didn't have within my

14  reach I didn't give.  There was information that I

15  had within my reach and others that I didn't.  What I

16  didn't have, I didn't give them.

17  Q.        But you stated yesterday -- I mean on Friday

18  that you did not voluntarily provide information to

19  the state court that you were actually dealing in

20  drugs while you were in jail?

21          MR. GONZÁLEZ-DELGADO:  And I'm talking about

22  Department of Corrections, Your Honor, I'm sorry.

23  Let me rephrase the question.

24  Q.        Did you state on Friday that you did not

25  voluntarily provide information to the Department of

Alex Miguel Cruz-Santos - Cross

1    Corrections that you continue to commit crimes in the

2    name of Los Ñetas?

3    A.       Voluntary.

4    Q.       Like you said, if they don't ask, you don't

5    tell.

6    A.       Yes, they would ask and you had to tell.

7    Q.       That's not my question.  My question was, if

8    they don't ask, you do not voluntarily state -- make

9    statements to them.

10            MR. ACEVEDO-HERNÁNDEZ:  Objection.

11   A.       Yes, I did make statements.

12            THE COURT:  Sustained.

13   BY MR. GONZÁLEZ-DELGADO:

14   Q.       Didn't you testify previously to the

15   question of why are you cooperating -- do you

16   remember having testified before a judge in a similar

17   case before, correct?

18   A.       Yes.

19   Q.       Do you remember having been asked a

20   question, Why are you cooperating?

21   A.       Yes.

22   Q.       Do you remember giving the answer that, I am

23   cooperating because I have been in prison my whole

24   life and now I have this and I am seeking better

25   accomodation in my sentence federal or state?

Alex Miguel Cruz-Santos - Cross

1    A.        Yes.

2    Q.        But even though you have stated that you

3    have no promises whatsoever or no agreements that

4    that will actually happen if you testify?

5    A.        No.

6             MR. GONZÁLEZ-DELGADO:  I have no further

7    questions.

8             THE COURT:  Ms. Lizarribar on behalf of

9    Mr. Millan-Machuca.

10            MS. LIZARRIBAR-MASINI:  Your Honor.

11            Good morning.

12                  CROSS EXAMINATION CONTINUED

13                           ---

14   BY MS. LIZARRIBAR-MASINI:

15   Q.        Sir, while you were in jail and you sold

16   drugs you made money, correct?

17   A.        I earned money and also the Ñeta

18   organization.

19   Q.        Let me ask you about your money.  You made

20   money, personal money, correct?

21   A.        I earned money.

22   Q.        Which you kept, correct?

23   A.        Yes.

24   Q.        Okay.  And you used that -- you used that

25   gain for buying a car, correct?

Alex Miguel Cruz-Santos - Cross

1   A.      Yes, I bought a car.

2   Q.      And for whom did you buy that car?

3   A.      For the person that was visiting me at that

4   time.

5   Q.      Was she your wife?

6   A.      No, a friend.

7   Q.      A friend you had.

8           Did you also pay for her phone?

9   A.      Yes.

10  Q.      Besides her going to see you did she also

11  get drugs for you?

12  A.      No.

13  Q.      No.

14          You have said here that you had someone

15  outside of jail who got drugs for you, correct?

16  A.      Yes.

17  Q.      Someone that you did trust, correct?

18  A.      Yes.

19  Q.      Did you pay for that, sir?

20  A.      Yes, I paid for that.

21  Q.      You gave -- whoever it was you gave money

22  for them to get drugs for you to get into jail?

23  A.      Yes, I had persons who would do the

24  movement.

25  Q.      You had more than one person?

Alex Miguel Cruz-Santos - Cross

1    A.        Yes, you always have more than one person.

2    Q.        Okay.  And how many did you have?

3    A.        I had three women.

4    Q.        All of them females?

5    A.        I had three females and the person who had

6    the drugs out on the street was a guy who was in drug

7    trafficking.  And sometimes purchases would be done

8    with Bambani who was the one I had the relationship

9    with or Cigueña.

10   Q.        So besides what you did in jail you also

11   outside had people who worked for you, got you drugs

12   and brought you drugs and you paid them for that?

13   A.        Yes, when you have the position of leader

14   you have to have a work plan such as required by the

15   maximum leadership.

16   Q.        Okay.  And of that money you made, did you

17   save money for yourself when you get out of jail?

18   A.        Yes.

19   Q.        Okay.  Do you still have that money?

20   A.        Right now I don't even have a little bit of

21   that money.

22   Q.        It has been spent?

23   A.        Yes.

24   Q.        You have spent it, correct?

25   A.        Yes, that's right, yes.

Alex Miguel Cruz-Santos - Cross

1  Q.      You gave to your family.

2  A.      Yes, on occasions, yes.

3  Q.      To your mother?

4  A.      One time, could be.

5  Q.      To your sisters?

6  A.      One or twice it could be.

7  Q.      To your ex-wife?

8  A.      No, not the ex-wife.

9  Q.      Jessica you did not give her money?

10  A.      Jessica Delgado she's the mother of my

11  daughter and I'm separated from her from many years

12  ago.

13  Q.      Now, sir, you have told us here that no one

14  has told you what time you will do in jail for this

15  case, correct?

16  A.      I signed a plea.

17  Q.      Okay.  You signed a plea and you signed a

18  plea with guidelines, correct?

19  A.      Yes.

20  Q.      Do you know what those are, the guidelines

21  what they are?

22  A.      Yes.

23  Q.      Okay.  And you were asked here that you were

24  going to ask for a sentence with a guideline of 28,

25  correct?

Alex Miguel Cruz-Santos - Cross

1   A.        Well, I can't ask for guidelines.  The

2   guidelines fall within your criminal history.

3   Q.        You were asked if you were going to ask for

4   a sentence within a guideline, specific guideline,

5   28?

6   A.        That's how I ended up with 28 points.  I

7   mean I didn't ask for it.

8   Q.        When you go back to court, whenever it is,

9   to be sentenced, do you have to ask for a sentence

10  within that guideline?

11  A.        No.

12  Q.        No?

13            Let me show you, sir, your plea and I am

14  going to ask you to read page 5, paragraph 9.

15            THE COURT:  If you would please refer to it

16  by exhibit number so the record's clean.

17            MS. LIZARRIBAR-MASINI:  Thank you, Your

18  Honor.  This is 4, Exhibit No. 4 for the government.

19            THE COURT:  Thank you.

20  Q.        Could you please read on that page where it

21  says, Sentence Recommendation.

22            MS. LIZARRIBAR-MASINI:  Could you translate

23  it to him, please.

24            THE INTERPRETER:  Yes.

25  A.        Yes.  Determined by the Court.

Alex Miguel Cruz-Santos - Cross

1   Q.       Okay, determined by the Court.

2            And you are bound to ask for a sentence

3   within Guideline 28, correct?

4   A.       I'm not obligated.

5   Q.       Let me read to you.  The parties reserve the

6   right to recommend a sentence within the applicable

7   guideline sentencing range for a total offense level

8   of 28.

9   A.       Uh-huh.

10  Q.       What does that mean to you, sir?

11  A.       Well, that was the points for my criminal

12  history, for my criminal trajectory, that's the

13  level.

14  Q.       So you have to have two things:  Offense

15  level 28 and your points from your past history,

16  criminal history, correct?

17  A.       Yes.

18  Q.       Okay.  But it's always within Guideline

19  Level 28, correct?

20  A.       Level 28.

21  Q.       Okay.  And in your plea agreement which you

22  signed, Exhibit 4 for the government, there is -- at

23  page 4 there is a range that is given to you

24  according to your points, like you say, criminal

25  history points, correct?

Alex Miguel Cruz-Santos - Cross

1    A.        Yes.

2    Q.        So, sir, we see -- and I am pointing here,

3    this is the range, total offense level 28, and then

4    it goes to the side and it has different numbers,

5    correct, sir?

6    A.        Mm-hmm, different numbers.

7    Q.        And you tell us those are your points

8    according to your past history, criminal history,

9    correct?

10   A.        Correct.

11   Q.        So, if you are a I, you would request a

12   sentence between 78 months and 97 months, correct?

13   A.        Not that.

14   Q.        And you are what?  Do you know what is your

15   history, criminal history points?  Do you fall within

16   a II, III, IV, V or VI?

17   A.        A III.

18   Q.        You are a III.  So, let's see, we go to

19   total offense level 28, Criminal History

20   Category III, and what numbers do we have here, sir?

21   A.        97 to 121.

22   Q.        Okay.  So when you go back to court to be

23   sentenced you have to ask for a sentence between

24   97 months to 121 months, correct?

25   A.        No, because at the end of it all it's the

Alex Miguel Cruz-Santos - Cross

1    judge that imposes the sentence.  I can't decide.  At

2    the end it's the judge who imposes the sentence.

3    Q.      Correct, sir.  However, however, you signed

4    Exhibit 4 with the government, correct?

5    A.      Yes.

6    Q.      This is a plea agreement, correct?

7    A.      Yes.

8    Q.      And why did you sign this?

9    A.      Because it's my cooperation plea.

10   Q.      Okay.  And this plea agreement was not

11   signed by a judge, correct?

12   A.      No.

13   Q.      This is only between you and the government,

14   correct?

15   A.      Yes.

16   Q.      So you both know what you can ask the Court

17   for a sentence in your case, right?

18   A.      Yes, well, in the -- in the process, yes.

19   When the process finishes.

20   Q.      Now, you have told us that the Court is not

21   bound by this document, correct?

22   A.      He's not bound by the agreement.

23   Q.      Okay.  And precisely at page 3, paragraph 6

24   it says that your sentence is within the sound

25   discretion of the sentencing judge.

Alex Miguel Cruz-Santos - Cross

1   A.          At his discretion.

2   Q.          But that judge has to take into account the

3   sentencing guidelines, correct?

4   A.          Well, he's the one that imposes the final

5   sentence.  Well, he might have recommendations but I

6   don't know if he's going to sentence me following the

7   recommendations.

8   Q.          Correct, sir.

9               However, what I asked of you was that the

10  judge has to take into account the sentencing

11  guidelines, correct?

12  A.          Well, yes.

13  Q.          Okay.  Which is those numbers that we saw

14  before.

15  A.          Yes.

16  Q.          Okay.  And that judge can give you a higher

17  sentence or a lower sentence, correct?

18  A.          Higher or lower.

19  Q.          Okay.  And because he can do that, that is

20  why you signed a plea agreement supplement, correct?

21  A.          No, I signed the plea but it doesn't have to

22  be because of that.

23  Q.          The question, sir, is, you also signed a

24  plea agreement supplement.

25  A.          Yes.

Alex Miguel Cruz-Santos - Cross

1    Q.       Okay, which is Government's Exhibit 5,

2    correct?

3    A.       Yes.

4    Q.       And, again, this is between you and the

5    government, correct?

6    A.       Yes.

7    Q.       Okay.  And why did you sign a plea agreement

8    supplement?  What is that for?

9    A.       To seek an improvement.

10   Q.       Improvement in the sentence to be imposed,

11   correct?

12   A.       That's going to be imposed.

13   Q.       Okay.  Because it's for substantial

14   assistance, correct?

15   A.       There's help, yes.

16   Q.       And that is your help to the government,

17   correct?

18   A.       Yes.

19   Q.       Okay.  And to the questions of counsel,

20   government counsel, you said that you did not have to

21   make a case, you only had to tell the truth, correct?

22   A.       Yes.

23   Q.       Okay.  Now, let's look at Government's

24   Exhibit 5, page 4.  The government reserves the right

25   to carry out its, what, responsibilities, correct?

Alex Miguel Cruz-Santos - Cross

1    A.        Correct.

2    Q.        And at paragraph 7 it says that they reserve

3    the option to seek a downward departure.

4    A.        Yes.

5    Q.        They reserve the option.  So they decide

6    whether they do it or not, correct?

7    A.        Who's "they"?

8    Q.        The government?

9    A.        They recommend but they don't decide.

10   Q.        They don't decide the final sentence, they

11   make a recommendation.  But they have an option,

12   correct?

13   A.        Yes, they have an option.

14   Q.        Do you know what that is?

15   A.        To reduce the sentence, an improvement.

16   Q.        Or they can do nothing, they can say I am

17   not going to seek a downward departure, correct?

18   A.        They can also do that.

19   Q.        So they are not bound to seek a downward

20   departure in your sentence.

21   A.        No.

22   Q.        Okay.  Now you have told us here several

23   times, many times, that the sentence to be imposed is

24   decided by the judge, correct?

25   A.        The final one, yes.

Alex Miguel Cruz-Santos - Cross

1  Q.        And we saw the guidelines in your case --

2  applicable to your case, correct?

3  A.        Yes.

4  Q.        Now, when you signed the plea even though

5  you were a member of the Ñeta, like you say a leader,

6  chapter leader selling drugs for many years, what you

7  pled to was the base offense level of being

8  responsible for only 400 grams but less than

9  700 grams of heroin, correct?

10 A.        Correct.

11 Q.        Okay.  Now, in those years that you were

12 selling drugs you sold much more than that amount,

13 correct?

14 A.        Well, yes.

15 Q.        Yes.

16         So, when you sat with the government to sign

17 this plea you got a benefit from signing to a lower

18 amount of drugs, correct?

19 A.        Yes, when you plead guilty.

20 Q.        Right.

21         So you pled to a very low amount of drugs,

22 correct?

23 A.        Yes.  Yes.

24 Q.        If you had pled to all the drugs that you

25 dealt with you would have pled to a very high level,

1  correct, guideline level?

2  A.      Yes.

3  Q.      Okay.  And that would have meant many more

4  years in jail, correct?

5  A.      Yes.

6  Q.      So when you signed this you did start with a

7  very low expectation of a sentence, correct?  A

8  benefit, sir, of signing to a lesser amount of drugs.

9  A.      Yes.  When I pled guilty automatically, yes,

10  yes.

11  Q.      Now, you told us that you were a history

12  three, Criminal History III, and we saw the numbers

13  that go with that guideline which were 97 to

14  121 months, correct?

15  A.      Correct.

16  Q.      But you don't want to be in jail for

17  97 months, correct?

18  A.      Well, that's correct.

19  Q.      That is almost ten years, correct?

20  A.      Almost ten years.

21  Q.      And that is a time you don't want to serve

22  correct, you personally?

23  A.      Yes.

24  Q.      And because of that, that is why you signed

25  the cooperation agreement.

Alex Miguel Cruz-Santos - Cross

1   A.        Yes.

2   Q.        Okay.  You have told us that the sentence to

3   be imposed is only by the judge; and no one has told

4   you how you will be sentenced.

5   A.        Exactly.

6   Q.        So as of today you don't know what your

7   sentence will be.

8   A.        No, because I have one here and in state

9   court.  I wouldn't know...

10  Q.        Let me ask you, what is it that you have in

11  state court?

12  A.        I have 102 years total sentence.

13  Q.        That was from your first case, the murder

14  case, correct?

15  A.        The first case, yes.

16  Q.        Okay.  And then you have this case.

17  A.        I now have the federal case.

18  Q.        So you might be sentenced in this case and

19  then serve this case and have to go back to state

20  jail to serve the other sentence, correct?

21  A.        Yes, but if I have to do it, I have to do

22  it.

23  Q.        Okay.  Do you hope that someone, the

24  government here, will do something to help you with

25  that state sentence you have pending?

Alex Miguel Cruz-Santos - Cross

1    A.        I would hope so.

2    Q.        And what is it that you hope that they could

3    do?

4    A.        I would hope that they help me in my state

5    sentence or in the parole board.

6    Q.        Parole board.  Have you been there to the

7    parole board?

8    A.        I've never gone.

9    Q.        So you are hoping that the government, the

10   Federal Government, will help you with either one of

11   those or both, correct?

12   A.        Or that it be one.

13   Q.        With just one you would be happy?

14   A.        I would at the very least have a date that I

15   would come out.

16   Q.        Sir, in your mind, like you have said, do

17   you have a sense of in what time, what year you will

18   come out of jail if everything goes according to what

19   you think will happen?

20   A.        No, I have no idea.

21   Q.        So it could be in five years, ten years,

22   15 years, two months, three months, six months,

23   correct?

24   A.        Correct.

25   Q.        Okay.  Sir, you told us that you are now at

Alex Miguel Cruz-Santos - Cross

1    MDC, correct, the federal prison?

2    A.       MDC Guaynabo.

3    Q.       Okay.  And you are placed in 4-Charlie,

4    correct, 4-C, the unit 4-C?

5    A.       Yes, in 4-Charlie.

6    Q.       And can you tell the jury what 4-Charlie is?

7    A.       4-Charlie is a section where there's only

8    witnesses that are state or federal witnesses.

9    Q.       So the ones that you see, meet with, live

10   with, are the ones who are just like you,

11   cooperators?

12   A.       There are cooperators.

13   Q.       Now, sir, while in 4-Charlie -- let me ask

14   you first how long have you been in 4-Charlie, since

15   when?

16   A.       It's been 31 months.  Since 2015,

17   October 15th, around that is that I started there.

18   Q.       Now, sir, while you are in 4-Charlie you can

19   see family members who come to visit you, correct?

20   A.       Yes.  If they're written down, yes.

21   Q.       And you can also make phone calls, correct?

22   A.       You can make calls.

23   Q.       And those are made by you, correct?

24   A.       Yes.

25   Q.       And you know that they are recorded,

Alex Miguel Cruz-Santos - Cross

1    correct?

2    A.       They're recorded.

3    Q.       Okay.  And you told your mother, correct --

4    you call your mother, correct?

5    A.       From time to time I call her.

6    Q.       Because, as you said here, you love her,

7    correct?

8    A.       Yes, I love her.

9    Q.       She's family?

10   A.       Yes.

11   Q.       Okay.  And you also talk to your sisters,

12   correct?  You talk to Beba?

13   A.       One time I -- several times I spoke to Beba.

14   Q.       And, sir, when you made those phone calls

15   and you came into 4-Charlie you were advised phone

16   calls are recorded, correct?

17   A.       Yes.

18   Q.       And in fact you signed a document in which

19   it says, I know phone calls are recorded, correct, I

20   have knowledge they are?

21   A.       Yes.  You don't sign it or anything but

22   there's a document on it.

23   Q.       Now, sir, have you, in the phone calls that

24   you have made to your family, to your mother

25   specifically, have you told her that you will be out

Alex Miguel Cruz-Santos - Cross

1    of jail by 2020, the year 2020?

2    A.        2020?

3    Q.        2020.

4    A.        No, I said that I hope to come out at some

5    point but not an exact date.

6    Q.        You have not given your mother a date or a

7    year, sir, not a date, a year in which you hope to be

8    out?

9    A.        What I told my mother is that my parole

10   board is for 2019.

11   Q.        Okay.  As to this case, federal case, have

12   you told your mother if you serve a lot of time you

13   will be out by the year 2020, that is in two years,

14   correct?

15   A.        No, I haven't told her that.

16   Q.        Now, have you told your mother that the only

17   reason you were still in jail as of today, last

18   month, last week, two months ago, is because

19   defendants want to go to trial and that has made you

20   stay in jail?

21   A.        I haven't told her there's a trial.

22   Q.        Okay.  So you have never told her, The only

23   reason that I am still in jail is because defendants

24   want to go to trial and that's why I'm stuck in jail?

25   A.        No.  What -- I really haven't told her very

Alex Miguel Cruz-Santos - Cross

1   clearly about things because her health isn't that

2   good.  So what I told her is that, you know, to stay

3   calm that I'm here, that there's a federal problem.

4   That's more or less what I told her.  I also told her

5   that I'm cooperating but I really haven't told her

6   the details of it.

7   Q.      You have not told your --

8   A.      And I haven't told her a date either.

9   Q.      You have not told your mother that once this

10  trial is over everyone else is going to sign because

11  they will be scared?

12  A.      No.

13  Q.      No, you haven't said that.

14          Okay.  Now, sir, in the phone calls that you

15  have made to your mother you have asked your family

16  to send money to Cynthia, her son, correct?

17  A.      No.

18  Q.      You haven't said that?

19          You haven't told your family to send money

20  to the son she has who is gay, José Ortíz-González,

21  also known as Naika?

22  A.      What happens is that Cynthia is my friend

23  and she at a certain point deposited some money to

24  me.  She always wanted to help me.

25  Q.      But the question is, sir, if in the phone

Alex Miguel Cruz-Santos - Cross

1   calls that you made from MDC to your family you have

2   asked your family to deposit money or give money to

3   Cynthia's son.  Naika, correct?

4   A.        It was once.

5   Q.        So you did say that?

6   A.        Once.

7   Q.        And while in jail you talked to Cynthia,

8   correct?

9   A.        Yes, I would talk to Cynthia while I was in

10  jail.

11  Q.        But that was not that you called her,

12  correct, by a telephone, correct?

13  A.        No, not Cynthia.

14  Q.        The way that you spoke to her was through

15  using the toilets, correct?

16  A.        Yes, the toilets was an intercom that was

17  there before and that was being used.

18  Q.        And after you talked to Cynthia you spoke to

19  one of the agents and told the agent, Cynthia wants

20  to be taken out, Cynthia has information?

21  A.        Yes.  That, yes.

22  Q.        And that Cynthia wanted, and excuse me, to

23  screw *Papito* because she was angry with him.

24  A.        Yes.  Cynthia was *Papito*'s girlfriend and

25  she was a person that would do the things of drug

Alex Miguel Cruz-Santos - Cross

1   trafficking for *Papito*.  She was a speaker.

2   Q.      But in those phone calls that you made and

3   you spoke to one of the agents you told the agent

4   that Cynthia wanted to screw *Papito* because she was

5   angry, that is what you said.

6   A.      Yes.

7   Q.      Okay.

8           THE COURT:  Ms. Lizarribar, we're going to

9   take a second break right now for ten minutes.

10          MS. LIZARRIBAR-MASINI:  Okay.

11          THE COURT:  Ladies and gentlemen, we're just

12  going to take another short break just so you guys

13  can stretch out.  We'll see you back here in ten

14  minutes.

15          I want to see counsel at the side, please.

16          (The Jury exits the room.)

17          (Sidebar discussions begin.)

18          THE COURT:  So I got this communication from

19  Juror 14.  "By the way, I would like to request an

20  opportunity to visit my primary doctor to check my

21  left ear.  I was with my kids at a community pool and

22  had this ear infection since yesterday that is

23  causing me pain.  My primary doctor can be reached

24  during the morning.  I've taken a pain reliever this

25  morning that has reduced a little of the pain, but my

Alex Miguel Cruz-Santos - Cross

1    left ear is partially clogged but I can endure for

2    today's trial."

3           So I'm going to have him come in and right

4    here ask him what this -- have him make the call and

5    see what the situation is, okay?

6           MS. HILL-ADAMES:  Yes, okay.

7           THE COURT:  Bring him.

8           (Juror No. 14 joins the sidebar.)

Alex Miguel Cruz-Santos - Cross

16    (Juror No. 14 leaves sidebar.)

17    MS. LIZARRIBAR-MASINI:  If I may, Judge, I

18  just want to advise the Court that I have the phone

19  calls that I have said in my cross and I will put

20  them on.  I'm going to give counsel a copy of the

21  phone calls right here.

22    MR. ACEVEDO-HERNÁNDEZ:  Sure.

23    MS. LIZARRIBAR-MASINI:  These are MDC

24  recordings.  I got them with a court order.  And I

25  had hundreds of them so I just --

Alex Miguel Cruz-Santos - Cross

1      MR. ACEVEDO-HERNÁNDEZ:  I'm just getting

2  discovery now, I guess.

3      MS. LIZARRIBAR-MASINI:  Well, his

4  testimony --

5      MR. ACEVEDO-HERNÁNDEZ:  Talk to the judge.

6      MS. LIZARRIBAR-MASINI:  His testimony was

7  last week.  Today, now, is that I know what I have

8  that I can use for cross.  I didn't know before.  As

9  I said, I have hundreds of phone calls for him and

10  when he testifies here is that I can see what he is

11  saying now that is different from what he has told

12  other people.  Those are his statements to his

13  family, to his mother, recorded, officially given to

14  me by a court order.

15      THE COURT:  So how many of these calls are

16  there?

17      MS. LIZARRIBAR-MASINI:  Well, I have --

18      MR. ACEVEDO-HERNÁNDEZ:  *Se llama* collateral

19  impeachment.  *Se llama* collateral impeachment.

20      MS. LIZARRIBAR-MASINI:  I have hundreds of

21  them but I'm going to use four, Your Honor.

22      THE COURT:  Okay.

23      MS. LIZARRIBAR-MASINI:  Maybe five.

24      THE COURT:  So, can you share those four

25  with your brother right now --

1          MS. LIZARRIBAR-MASINI:  Yes.

2          THE COURT:  And then take a look at them and

3     let me know.

4          MR. ACEVEDO-HERNÁNDEZ:  Sure, but in the

5     meanwhile, Your Honor, just for the record, we filed

6     a motion for reciprocal discovery, we got none.

7     We're just getting bombarded now with discovery.  And

8     a second matter is, this is collateral impeachment;

9     she's trying to extrinsically impeach my -- the

10    witness with a collateral matter that under First

11    Circuit law is inadmissible and inappropriate because

12    nothing that she has asked is non collateral.  So,

13    none of the questions she's posed is non collateral.

14    So, if this is allowed she would be allowed to bring

15    extrinsic evidence to impeach my witness on

16    collateral matters, Your Honor.

17         MS. LIZARRIBAR-MASINI:  If I may answer

18    that, one, he has told his mother many times, I will

19    be out by 2020 at the most.  I should be out by now,

20    I am free.  I am only in jail because there is a

21    trial but once this trial is over I'll be on the

22    streets.  That is not what he has said here to the

23    members of this jury.  That's one of them.  Okay?

24         Second, he has told his mother that he has

25    been erased his state case, that he has no longer

Alex Miguel Cruz-Santos - Cross

1  anything to serve in the state and he no longer has

2  to go to the board, the parole board, which is

3  contrary, Your Honor, to what he has said here under

4  oath.  And I think that as to what he thinks he is

5  going to get and what he has said here impeachment is

6  right here.  Those are his own statements.

7         THE COURT:  Thank you.  So explain to me

8  what you mean by extrinsic?

9         MR. ACEVEDO-HERNÁNDEZ:  Well, this is --

10  intrinsic would be with the own testimony of the

11  witness.  So when she asked the questions, intrinsic

12  would be from her and between the witness.  If she

13  brings other evidence outside of the declarant, that

14  automatically becomes extrinsic evidence; so, this

15  caused extrinsic evidence of impeachment.  It's other

16  evidence, nothing happening here in testimony in

17  court.  And she is supposed to live with the answer

18  that he gives to those questions.

19         So by allowing these calls this is extrinsic

20  evidence of impeachment of a collateral matter.  And

21  she -- you know, I don't think it's fair that we

22  give -- first, that she's going to be allowed to do

23  collateral impeachment and, second, that we give

24  discovery over a year in advance and then

25  literally --

Alex Miguel Cruz-Santos - Cross

1    THE COURT:  So why didn't you give him

2  copies of this stuff?

3    MS. LIZARRIBAR-MASINI:  Because I didn't

4  know, Judge, if they could even be used.

5    THE COURT:  So what?  It's still reciprocal.

6    MS. LIZARRIBAR-MASINI:  Okay, if he had said

7  to me, Yes, I have told her 2020, I'm done, there's

8  nothing else I can do.  If he had said to me, I did

9  tell her I don't have a case anymore in Ponce, I'm

10  done, there's nothing else I can do.  But he has said

11  to this jury --

12    THE COURT:  No, no, I understand why you

13  want to use it.  I get that.  But why didn't you give

14  him the calls?

15    MS. LIZARRIBAR-MASINI:  This is

16  cross-examination, Judge.

17    THE COURT:  I understand, but why didn't you

18  give him the calls?

19    MS. LIZARRIBAR-MASINI:  Because there are

20  hundreds, they would have said which ones are you

21  going to use.

22    THE COURT:  So what?

23    MS. LIZARRIBAR-MASINI:  I didn't -- you

24  know, I knew Friday that I could use three phone

25  calls.  Friday night I sat with my phone calls and

Alex Miguel Cruz-Santos - Cross

1    heard phone calls again to see what he had said under

2    oath before this Court to be able to go back and see

3    is there anything different in what he has told

4    others.  And that is when I found out, Friday night.

5    It wasn't before Friday.  It could have been that I

6    just couldn't have used any of them, so that was it.

7          THE COURT:  I'm not sure that excuses the

8    responsibility to not provide him with the calls from

9    the get-go and then it's up to him if he wants to dig

10   through them or not.  Right?

11         MR. ACEVEDO-HERNÁNDEZ:  When we did the

12   T-III we provided everything.  We're not using all

13   the hundred-plus calls that we intercepted during the

14   investigation.

15         MS. LIZARRIBAR-MASINI:  This is

16   cross-examination, Judge.  I understand that for

17   cross --

18         THE COURT:  Yeah, I understand, I

19   understand, but you've had these.

20         MS. LIZARRIBAR-MASINI:  -- I might have used

21   them or might have not.

22         THE COURT:  Yeah, but whether you use them

23   or not doesn't excuse the responsibility to provide

24   them.  Right?  I mean, you gave them to him and you

25   didn't use them, okay; you gave them to him and you

Alex Miguel Cruz-Santos - Cross

1    did use them, even better.

2         MS. LIZARRIBAR-MASINI:  But this is not

3    Rule 16 discovery, Judge.  This is impeachment and

4    this was during cross-examination.

5         MR. ACEVEDO-HERNÁNDEZ:  Also -- Your Honor,

6    we also don't have a transcript, it's not certified,

7    so now they're going to listen to calls in Spanish

8    and --

9         THE COURT:  Are they in Spanish or in

10   English?

11        MS. LIZARRIBAR-MASINI:  They are in Spanish,

12   Judge.

13        THE COURT:  So how are we going to do this?

14        MS. LIZARRIBAR-MASINI:  Well, I already

15   asked that transcripts be made.

16        THE COURT:  And do you have the transcripts?

17        MS. LIZARRIBAR-MASINI:  No, Judge.  I mean

18   this happened Friday night.  I worked all weekend, I

19   couldn't get anyone to transcribe the smaller

20   portions.  It's just seconds.

21        THE COURT:  Well, if you don't have the

22   transcript -- I mean I'm not saying you can't go

23   there.

24        MS. LIZARRIBAR-MASINI:  Okay.

25        THE COURT:  In fact, if you want, you might

Alex Miguel Cruz-Santos - Cross

1    even be able to recall this witness.  How much longer

2    are you going to be on cross?

3          MS. LIZARRIBAR-MASINI:  It's just the phone

4    calls, Judge, that's it.

5          THE COURT:  So you're at that point?

6          MS. LIZARRIBAR-MASINI:  I'm at that point.

7    If I can -- if I can call him back again, I will have

8    them done.

9          THE COURT:  Well --

10          MS. LIZARRIBAR-MASINI:  I'll have them done,

11    someone's doing them already.

12          THE COURT:  When do you expect you'll get

13    that?

14          MS. LIZARRIBAR-MASINI:  I suppose that by

15    tomorrow I will have them.

16          MR. ACEVEDO-HERNÁNDEZ:  Are they going to be

17    certified?

18          MS. LIZARRIBAR-MASINI:  Yes, they are.  I

19    comply with the local rule.

20          THE COURT:  This is your fault.

21          MS. LIZARRIBAR-MASINI:  No, no, I know the

22    rule Judge.

23          THE COURT:  That makes one of us.  So, let's

24    do this, I'm not going to say no and I'm not going to

25    say yes.  Let's give your brother a chance to look at

Alex Miguel Cruz-Santos - Cross

1    what you've designated --

2           MS. LIZARRIBAR-MASINI:  Sure.

3           THE COURT:  -- and then we'll go through

4    this.  If you said you have a case on extrinsic

5    versus --

6           MR. ACEVEDO-HERNÁNDEZ:  I'll bring it, Your

7    Honor.

8           MS. LIZARRIBAR-MASINI:  I'll bring you case

9    law.

10          MS. HILL-ADAMES:  Your Honor, 608(b) does

11   not bar extrinsic evidence on every occasion.  He is

12   misleading the Court by telling the Court --

13          MR. ACEVEDO-HERNÁNDEZ:  No.

14          MS. HILL-ADAMES:  Yes, you are.  When you

15   say that extrinsic evidence is always excluded,

16   that's not right.

17          MR. ACEVEDO-HERNÁNDEZ:  What I said to the

18   Court is that she forgot to mention that I mentioned

19   the word collateral and non collateral.  You have to

20   read 608(b) with collateral.

21          MS. LIZARRIBAR-MASINI:  I also have case law

22   and I will bring it to the Court.  We have used it,

23   Your Honor.  I have used it with him in other cases.

24          MR. ACEVEDO-HERNÁNDEZ:  And I learned to

25   object by being hit by it before.

Alex Miguel Cruz-Santos - Cross

1      THE COURT:  All right, I'll see you guys.  I

2  don't know what we're going to do about that juror so

3  let's play it by ear.

4      MS. HILL-ADAMES:  He has an earache and it

5  being so cold he must be in a lot of pain.

6      THE COURT:  Yeah, no kidding.

7      MS. LIZARRIBAR-MASINI:  Will you tell the

8  jury that at this time will I will stop but I have an

9  opportunity bring him back?

10      THE COURT:  Let me think about that.  I've

11  got to figure out something.

12      MS. LIZARRIBAR-MASINI:  Okay.

13      (The Court exits the room.)

14      (Jury recessed at 12:02 p.m. and resumed at

15  12:06 p.m.)

16      THE COURTROOM DEPUTY:  All rise.

17      (The Court enters the room.)

18      THE COURT:  Ms. Lizarribar, except for that

19  issue you are done with this witness?

20      MS. LIZARRIBAR-MASINI:  Yes, Your Honor.

21      MR. ACEVEDO-HERNÁNDEZ:  Your Honor, I have

22  case law.

23      THE COURT:  Break at our usual time 12:30.

24  I have an emergency hearing I picked up from up top

25  that I'm going to take at quarter of 1:00 to 1:30, so

Alex Miguel Cruz-Santos - Cross

1  hopefully we'll start right at 1:30.

2       MS. LIZARRIBAR-MASINI:  Okay.  Judge, shall

3  I then stop now and then --

4       THE COURT:  I'll ask you if you have any

5  further questions and then -- actually I think what

6  I'll do is just tell the jury that for now you're

7  suspending your cross and that this witness may or

8  may not be called back.

9       MS. LIZARRIBAR-MASINI:  Thank you, Judge.

10       THE COURT:  Do you have redirect?

11       MR. ACEVEDO-HERNÁNDEZ:  It's going to be

12  short, Your Honor.

13            (The Jury enters the room.)

14       THE COURT:  So ladies and gentlemen,

15  Ms. Lizarribar is going to suspend her examination of

16  this witness for the time being.  We may or may not

17  allow her to recall him for cross.  There's an issue

18  that we need to work out and depending on how that

19  works out we may have him back.  But for right now

20  Mr. Acevedo is going to redirect the witness.

21       Thank you, Ms. Lizarribar.

22       MS. LIZARRIBAR-MASINI:  Thank you, Judge.

23            REDIRECT EXAMINATION

24                   ---

25  BY MR. ACEVEDO-HERNÁNDEZ:

Alex Miguel Cruz-Santos - Redirect

1   Q.      Sir, you were asked by the defense whether

2   murder for hire was allowed under the rules of the

3   organization; do you remember that?

4   A.      Yes.

5   Q.      Was there murder for hire in the Asociación

6   Ñeta?

7   A.      Yes.

8   Q.      What year?

9   A.      2014.

10  Q.      Was the -- what murders in 2014 happened

11  that were for hire in La organization Ñeta?

12  A.      Mario M., August 27, 2014.

13  Q.      What other murder, if any, was for hire in

14  La Asociación Ñeta in that year?

15  A.      Alexis *"El Loco"* on November 6th.

16  Q.      Sir, you were also asked questions by

17  counsel as to drugs given as donations; do you

18  remember that?

19  A.      Yes.

20  Q.      How are drugs that are given as donations

21  entered into prison?

22  A.      Through pathways.

23  Q.      Are they the same -- do you know if they are

24  the same pathways that are used to introduce the

25  drugs that are sold by the organization?

Alex Miguel Cruz-Santos - Redirect

1    A.      Yes.

2    Q.      Are they the same?

3    A.      They are the same.

4    Q.      Sir, counsel for Miguel Rivera-Calcaño asked

5    you a question about when you talked to Miguel

6    Rivera-Calcaño, he cut you off; what were you trying

7    to explain?

8            MR. VÉLEZ-GOVEO:  Objection, Your Honor.

9            THE COURT:  Sustained.  I'll let you go

10   there just go without the characterization.

11           MR. ACEVEDO-HERNÁNDEZ:  Yes, Your Honor.

12   BY MR. ACEVEDO-HERNÁNDEZ:

13   Q.      When you were asked questions as to when you

14   spoke to Miguel Rivera-Calcaño, can you explain who

15   told you you were going to speak with him.

16   A.      Yes.

17   Q.      Can you explain.

18   A.      Cigueña and Sandwich.  What happens is that

19   when a person is appointed to a position

20   automatically you're told that one of the two or the

21   two are going call you, usually someone that's

22   closest, and they tell you that they're going to

23   collect the status on the 25th.  And they tell you,

24   If I don't call you then somebody else will call you

25   because it's -- well, it's a lot of prisons.

Alex Miguel Cruz-Santos - Redirect

1    Q.        And why do you say that Cigueña and Fernan

2    Sandwich both called you?

3    A.        Well, to tell me that from now on that he

4    was going to be in charge and he was going to call me

5    asking me for the information on the status because

6    not everybody can call you to do that.  See, there's

7    Cigueña or somebody who has already been classified

8    to do that.

9    Q.        Did they call you at the same time or did

10   they call you separately?

11   A.        No, he calls me him alone.

12   Q.        Who?

13   A.        Cigueña calls me by himself or Sandwich

14   tells me that in person, because we lived in the same

15   module.  Or Kikirimiau calls me.

16   Q.        Sir, you were also asked questions as to

17   Government's Exhibit 5; do you remember that?

18   A.        Yes.

19   Q.        Sir, I ask you, under the terms of your

20   cooperation supplement what is your only obligation?

21   A.        To tell the truth.

22            MR. ACEVEDO-HERNÁNDEZ:  I have no further

23   questions, Your Honor.

24            THE COURT:  Thank you.  Ms. Hill, any

25   followup?

Alex Miguel Cruz-Santos - Redirect

1          MS. HILL-ADAMES:  No, Your Honor.

2          MR. VÉLEZ-GOVEO:  None, Your Honor.

3          MR. GONZÁLEZ-DELGADO:  I have none further.

4          MS. LIZARRIBAR-MASINI:  Maybe Your Honor you

5    can --

6          THE COURT:  Thank you, Mr. Cruz-Santos.  You

7    may step down.

8          United States.

9          MR. ACEVEDO-HERNÁNDEZ:  Yes, Your Honor.

10   The United States calls Alejandro Estrada-Deida.

11         THE COURTROOM DEPUTY:  Please raise your

12   right hand.

13         Do you solemnly swear that the testimony

14   you're about to give in the case now before the Court

15   will be the truth, the whole truth and nothing but

16   the truth, so help you God?

17         THE WITNESS:  I do.

18         THE COURTROOM DEPUTY:  Thank you, sir, you

19   may be seated.

20         MS. LIZARRIBAR-MASINI:  Your Honor, may we

21   go sidebar.

22         (Sidebar discussions begin.)

23         MS. HILL-ADAMES:  We would like to know if

24   this witness is going to talk about drug seizures.

25         MR. ACEVEDO-HERNÁNDEZ:  No, he's going to

1    talk about a cell phone that was seized in the prison

2    where Carlos Baez-Figueroa, who is the person

3    depicted in Exhibit 19, was; and that cell phone was

4    subsequently searched by the FBI who was going to be

5    the next witness.  And inside that phone the photo of

6    Carlos Baez-Figueroa was found and a drug ledger

7    detailing the finances of the organization was found.

8          MS. HILL-ADAMES:  Okay, but we would like to

9    know how they're linking this exhibit to the actual

10   Ñeta and the allegations in the indictment.

11          MR. ACEVEDO-HERNÁNDEZ:  Because the cell

12   phone was seized in the prison.

13          If I may be heard, first of all, sorry.

14          THE COURT:  Of course.

15          MR. ACEVEDO-HERNÁNDEZ:  Sorry, I forget

16   sometimes.  The cell phone was seized, Your Honor, in

17   a cell where Carlos Baez-Figueroa, which is the photo

18   we've already shown to the witness and she said that

19   was the main leader for the organization, was seized

20   in that cell.  The cell phone the search of that cell

21   phone revealed a photo of him and a drug ledger of

22   the organization which would be shown to other

23   cooperating witnesses and will be explained.  And, by

24   the way, the drug ledger has the a/k/a of her client

25   and her client.

1           MS. HILL-ADAMES:  Did you say that the

2    ledger was seized from inside the cell of a Ñeta

3    member?

4           MR. ACEVEDO-HERNÁNDEZ:  Yes.  The phone that

5    has the same --

6           MS. HILL-ADAMES:  Yes?

7           MR. ACEVEDO-HERNÁNDEZ:  Well, the phone was

8    seized in a prison cell where Carlos Baez-Figueroa

9    was housed.  Inside the phone when they searched it

10   they found a photo of Carlos Baez-Figueroa and a drug

11   ledger that has your client's a/k/a and your client's

12   a/k/a.  I provided this in discovery.

13          MS. HILL-ADAMES:  Your Honor, we have an

14   objection to the admissibility of the ledger because

15   the ledger is not seized.  There's no evidence that

16   the ledger was seized from a cell where there's a

17   Ñeta member.  There's lots of inmates that --

18          THE COURT:  Let's do this, when we get to

19   that point let's see what the foundation is and then

20   I will hear you further.  Okay?

21          MS. HILL-ADAMES:  Okay, yes, Your Honor.

22          (Sidebar discussions end.)

23                              ---

24          OFFICER ALEJANDRO ESTRADA-DEIDA, a witness

25   called on behalf of the Government, having been duly

1    sworn by the Courtroom Deputy, was examined and

2    testified as follows:

3                        DIRECT EXAMINATION

4                              ---

5    BY MR. ACEVEDO-HERNÁNDEZ:

6    Q.        Sir, good morning.  Can you please state

7    your name to the members of this jury.

8    A.        Alejandro Estrada-Deida.

9    Q.        Mr. Estrada, for whom do you currently work?

10   A.        For the Department of Corrections.

11   Q.        And what are your duties with the Department

12   of Corrections?

13   A.        Sergeant of the canine unit.

14   Q.        Sir, when you say the "Department of

15   Corrections," is that the Puerto Rico Department of

16   Corrections?

17   A.        Yes.

18   Q.        And in the year 2012 what were your duties

19   in the Department of Corrections?

20   A.        Sergeant of the canine unit of Arecibo.

21   Q.        And what is it that you do as part of the

22   canine unit?

23   A.        Supervise searches, verify all procedures in

24   the institutions to avoid contraband.

25   Q.        Sir, I want to take your attention to

Officer Alejandro Estrada-Deida - Direct

1  January 22 of the year 2012; sir, what happened on

2  that date?

3  A.        We went to a search in the Guaynabo

4  institution and Officer Esteban Centeno, handler of

5  Canine Rex, he moves the dog through an area of that

6  building and the dog marks a contamination of a

7  cellular phone.  He tells me and I proceed to check

8  behind a TV finding a cellular phone HTC brand Sprint

9  and it was white.

10        I asked the officer of the institution to

11  give me the card of the inmate count and there I

12  verify what inmate sleeps on that bed; and the inmate

13  who slept on that bed was Mr. Carlos Baez.

14  Q.        Sir, I'm going to show you what has been

15  previously marked as Government's Exhibit 19; do you

16  know who is that that I'm showing you?

17  A.        No.

18  Q.        Showing you Government's ID 22 now, sir; do

19  you recognize that, sir?

20  A.        Yes.

21  Q.        What is that?

22  A.        The HTC cellular phone that I seized that

23  day.

24        MR. ACEVEDO-HERNÁNDEZ:  Your Honor, we move

25  Government's ID 22 into evidence.

Officer Alejandro Estrada-Deida - Direct

1    THE COURT:  Any objections?

2    MS. HILL-ADAMES:  We have an objection, Your

3    Honor, for the reasons stated.  We don't see the

4    relevancy and how it connects to this case.

5    THE COURT:  Let's do this, I'm going to mark

6    it for ID.  I'm going to holdup on its admissibility

7    until we establish a nexus.  I'm not excluding it,

8    but I need you to foundate [ph].

9    MR. ACEVEDO-HERNÁNDEZ:  Your Honor, may I

10   show Government's Exhibit 19 to the witness so he can

11   see it up-close.

12   MS. HILL-ADAMES:  Objection, Your Honor.

13   THE COURT:  You may.

14   MS. HILL-ADAMES:  Objection.

15   MS. LIZARRIBAR-MASINI:  Objection for the

16   record.

17   BY MR. ACEVEDO-HERNÁNDEZ:

18   Q.    Showing you Government's Exhibit 19, sir;

19   are you able to recognize that, sir?

20   A.    Yes.

21   Q.    Can you tell the members of the jury what

22   Government's Exhibit 19 depicts.

23   A.    Yes.  This is the picture of Mr. Carlos

24   Baez.

25   Q.    And how do you know that's Carlos Baez?

Officer Alejandro Estrada-Deida - Direct

1   A.          Because of the count card which states that

2   it has a picture that that's him.

3              MR. GONZÁLEZ-DELGADO:  Your Honor, we have

4   an objection.  May we approach.

5              THE COURT:  Yes, come up.  Actually let's do

6   this, we're close enough to the lunch hour.  We're

7   going to break, we'll see you back here at 1:30

8   thank.  You.

9              THE BAILIFF:  All rise.

10             (The Jury exits the room.)

11             THE COURT:  You can step down, sir.  Thank

12  you.

13             (Sidebar discussions begin.)

14             THE COURT:  So, I thought there was

15  something identifying on this.  What was the

16  objection?

17             MR. GONZÁLEZ-DELGADO:  My objection is, Your

18  Honor that, the witness stated when he was shown the

19  photo on the ELMO that he could not recognize it.

20  When the government brings the ID up to him, shows

21  him up-close, he says that that's the photo of the --

22  that's in the ledger of the jail that states who

23  sleeps in there.  And this picture was actually taken

24  from inside the cell phone; that is not the official

25  photo that he may have used to identify the alleged

Officer Alejandro Estrada-Deida - Direct

1       person who --

2              THE COURT:  Wouldn't that go more to its

3       weight than its admissibility and you get to cross

4       him on all that?

5              MR. GONZÁLEZ-DELGADO:  But still, Your

6       Honor, he said he didn't recognize.

7              MS. HILL-ADAMES:  He said he didn't

8       recognize that.

9              THE COURT:  That I got.

10             MS. HILL-ADAMES:  He couldn't identify it

11      until you approached him with the photo.

12             THE COURT:  There was nothing leading about

13      it.

14             MR. GONZÁLEZ-DELGADO:  My objection about it

15      is, Your Honor, that that's not the photo that the

16      witness is using to identify the person who allegedly

17      lived in that cell the day of the seizure.

18             MS. HILL-ADAMES:  And, furthermore, he

19      hasn't even said where, what module, what cell.  All

20      he said was an institution in Guaynabo.  We don't

21      even know what prison groups live there, if Ñetas

22      live there, if 27s live there.

23             MR. ACEVEDO-HERNÁNDEZ:  Your Honor, this is

24      all matters for cross.  We've laid a foundation that

25      this is the cell where a person that has been

Officer Alejandro Estrada-Deida - Direct

1  identified by a cooperating witness, is a maximum

2  leadership for the organization.  It was seized from

3  a TV in his cell block.

4          THE COURT:  All right.  So it's in.  I'll

5  let you cross on that obviously.

6          MS. HILL-ADAMES:  Even if it's outside of

7  the scope because he's not going to go in there.

8          THE COURT:  Yeah, you can go in there.

9          MS. LIZARRIBAR-MASINI:  If I may, Judge,

10  because I'm CJA counsel I need a Court order to be

11  able to pay for the transcripts, so I'm going to file

12  asking for one.

13          THE COURT:  Just get it to Omar and I'll

14  sign it right away.

15          MS. LIZARRIBAR-MASINI:  Okay, thank you.

16          MR. ACEVEDO-HERNÁNDEZ:  When can we provide

17  the Court the case.

18          THE COURT:  Give it to Omar and he'll give

19  that to me.  I'll see you guys at 1:30.  We'll break

20  back at 1:30.

21          (Sidebar discussions end.)

22          (The Court exits the room.)

23          (Jury trial recessed for lunch at 12:28 p.m.

24  and resumed at 1:33 p.m.)

25          THE COURTROOM DEPUTY:  All rise.

Officer Alejandro Estrada-Deida - Direct

1    (The Court and Jury enter the room.)

2    THE BAILIFF:  You may be seated.

3    THE COURT:  Mr. Acevedo, please.

4    MR. ACEVEDO-HERNÁNDEZ:  For the record, I'm

5    publishing again Government's Exhibit 19.

6    BY MR. ACEVEDO-HERNÁNDEZ:

7    Q.      Sir, Government's ID 22 you mentioned to us

8    that you seized it from a television -- or it was

9    seized behind a television set.  Can you explain

10   where is it that it was seized, the area.

11   A.      Behind the television in the bed that was

12   next to Carlos Baez.

13   Q.      And, sir, what place, what location of the

14   Puerto Rico Department of Corrections did this

15   happen?

16   A.      In Guaynabo.

17   Q.      Specifically where?

18   A.      In the Guaynabo jail.

19   Q.      Which one?

20   A.      What was previously called juvenile

21   institutions.

22   Q.      And in what area of that institution?

23   A.      In the area where his bed is located, next

24   to the bed you have the television, and behind the

25   television that's where it was.  The TV belongs to

Officer Alejandro Estrada-Deida - Direct

1   him.

2           MR. ACEVEDO-HERNÁNDEZ:  Your Honor, I tender

3   the witness.

4           THE COURT:  Who wants to be first?

5           MS. HILL-ADAMES:  No, Your Honor, I have no

6   questions.

7           MR. VÉLEZ-GOVEO:  I have no questions of the

8   witness, Your Honor.

9           MS. LIZARRIBAR-MASINI:  None, Your Honor.

10          MR. GONZÁLEZ-DELGADO:  I have none, Your

11  Honor.

12          THE COURT:  Thank you, sir, you may step

13  down.

14          MR. ACEVEDO-HERNÁNDEZ:  The next witness,

15  Your Honor, is Daniel Cabrero.

16          THE COURTROOM DEPUTY:  Please raise your

17  right hand.

18          Do you solemnly swear that the testimony

19  you're about to give in the case now before the Court

20  will be the truth, the whole truth and nothing but

21  the truth, so help you God?

22          THE WITNESS:  I do.

23          THE COURTROOM DEPUTY:  Thank you, sir, you

24  may be seated.

25                          ---

1          DANIEL CABRERO, a witness called on behalf

2     of the Government, having been duly sworn by the

3     Courtroom Deputy, was examined and testified as

4     follows:

5                    DIRECT EXAMINATION

6                         ---

7     BY MR. ACEVEDO-HERNÁNDEZ:

8     Q.        Sir, good afternoon.  Can you state your

9     name to the members of the jury.

10    A.        My name is Daniel Cabrero.  Last name is

11    spelled C-a-b-r-e-r-o.

12    Q.        And Mr. Cabrero for whom do you currently

13    work?

14    A.        I currently work for the FBI.

15    Q.        In what capacity?

16    A.        Special agent for the FBI.

17    Q.        Since when have you been an FBI agent?

18    A.        I've been an FBI since 2009, approximately

19    nine years.

20    Q.        And in the year 2012 what were your duties

21    as an FBI agent?

22    A.        I was assigned to the San Juan field office

23    division and I was working gangs, drug trafficking,

24    money laundering, among other things.

25    Q.        Sir, I want to show you what has been

Daniel Cabrero - Direct

1    previously marked as Government's ID 22; can you tell

2    this jury if you recognize that, sir.

3    A.        Yes, I do.

4    Q.        What is that that I'm showing you?

5    A.        It's a cell phone.

6    Q.        And how do you recognize it?

7    A.        It's a cell phone that was -- I did a

8    download from this cell phone back in January 2012.

9    Q.        How is it that you perform a download on

10   that phone?

11   A.        We have a system that the FBI uses to

12   download information from cell phone it's called

13   Cellebrite.  You just plug in the cell phone into the

14   machine and the machine downloads all the information

15   from the cell phone.

16            MR. GONZÁLEZ-DELGADO:  Your Honor, we have

17   an objection.  May we approach.

18            THE COURT:  Sure.

19            (Sidebar discussions begin.)

20            THE COURT:  Mr. González.

21            MR. GONZÁLEZ-DELGADO:  Your Honor, I have an

22   objection as to this witness testifying as to this

23   cell phone because it has not been admitted into

24   evidence and, second, no foundation --

25            THE COURT:  The cell phone's in evidence.

Daniel Cabrero - Direct

1    Hasn't it been offered?

2              MR. GONZÁLEZ-DELGADO:  No, Your Honor.

3              MR. ACEVEDO-HERNÁNDEZ:  Yes, it was offered

4    and the Court has conditionally admitted it.  So I'll

5    move --

6              THE COURT:  Okay, that's right that's,

7    right.  So it's not in but, yeah, okay.

8              MR. GONZÁLEZ-DELGADO:  And my objection is

9    that with the witness that could have identified that

10   cell phone as being the one that was seized and

11   provided to this guy -- to this agent, no evidence

12   was presented as to why he knew that it was the same

13   one.  All he said was that he looked at it and said,

14   This was the one I saw.  Without any identification,

15   no foundation.  And now this witness is going to

16   testify as to the contents of that cell phone without

17   it being introduced -- without it having been

18   admitted into evidence.  That's my objection, Your

19   Honor.

20             MR. ACEVEDO-HERNÁNDEZ:  Your Honor, we've

21   authenticated, we're about to move it into evidence

22   and continue with our direct.  I think those are all

23   things he could have explored in cross and goes to

24   the weight.

25             THE COURT:  Your objection's noted, I'll let

Daniel Cabrero - Direct

1   you proceed.

2           MR. ACEVEDO-HERNÁNDEZ:  Okay.

3           (Sidebar discussions end.)

4           MR. ACEVEDO-HERNÁNDEZ:  Your Honor, the

5   United States moves ID 22 into evidence.

6           THE COURT:  All right.  Subject to the

7   objections stated at sidebar it is so admitted.

8   BY MR. ACEVEDO-HERNÁNDEZ:

9   Q.      Sir, you were explaining to us how it is

10  that you perform a download on Government's

11  Exhibit 22; can you please continue to explain that

12  to the members of the jury.

13  A.      So, this is a program the FBI uses, it's

14  called Cellebrite.  You just plug in the cell phone

15  into the system and that system extracts all the

16  information contained in the cell phone.

17  Q.      And, sir, when you performed this

18  examination of Government's Exhibit 22 were, you able

19  to download anything from that cell phone?

20  A.      Yes.

21  Q.      If you were able to see items that were

22  downloaded from that phone would you be able to

23  recognize them?

24  A.      Yes.

25  Q.      Sir, showing you Government's Exhibit 19.

Daniel Cabrero - Direct

1    Do you know if that was downloaded from that cell

2    phone?

3    A.       Yes.

4    Q.       Was it downloaded from that cell phone?

5    A.       Yes, it was.

6             MR. ACEVEDO-HERNÁNDEZ:  May I approach the

7    witness, Your Honor.

8             THE COURT:  You may.

9    Q.       Sir, showing you Government's ID 23; do you

10   recognize that, sir?

11   A.       Yes.

12   Q.       Sir, was Government's ID 23 downloaded from

13   the cell phone which is Government's Exhibit 22?

14   A.       Yes, it was.

15            MR. ACEVEDO-HERNÁNDEZ:  Your Honor, at this

16   time we move Government's ID 23 into evidence.

17            THE COURT:  Any objection other than those

18   stated at sidebar?

19            MS. HILL-ADAMES:  No, Your Honor.

20            THE COURT:  So admitted.

21            MR. ACEVEDO-HERNÁNDEZ:  For the record Your,

22   Honor, I'm including a certified translation with

23   that document as it's in Spanish.

24            THE COURT:  Thank you.

25   BY MR. ACEVEDO-HERNÁNDEZ:

Daniel Cabrero - Direct

1   Q.      Sir, what does this state right here?

2   A.      *Informe Del Fondo General.*

3           MR. ACEVEDO-HERNÁNDEZ:  Should we get a

4   translation for that, Your Honor.

5           THE COURT:  Yes, please.

6           MR. ACEVEDO-HERNÁNDEZ:  Can the Court --

7           INTERPRETER SMITH:  Sorry, Your Honor, an

8   official translation of the document?

9           THE COURT:  Yes, please.

10          INTERPRETER LAÓ:  General Fund Report.

11  Q.      So the translation for -- and what does it

12  say there?

13          THE COURT:  Can you put the English, please.

14          MR. ACEVEDO-HERNÁNDEZ:  I'll start from the

15  beginning.

16          THE COURT:  Thank you.

17  Q.      So, what do we have here, sir?

18  A.      General Fund Report.

19          MR. ACEVEDO-HERNÁNDEZ:  And this is for the

20  record, first page of Government's Exhibit 23

21  translation.

22  Q.      And what does it state here?

23  A.      Investments and expenses.

24  Q.      And here?

25  A.      Donations.

Daniel Cabrero - Direct

1   Q.      And what do we have right here?

2   A.      Rolo.

3   Q.      And right next to it?

4   A.      800.

5   Q.      And below Rolo?

6   A.      Ten.

7   Q.      And next to it?

8   A.      200.

9   Q.      And what do we have right on the bottom

10  here?

11  A.      Total donations.

12  Q.      And next to that?

13  A.      5,250.

14  Q.      And what do we have at the bottom?

15  A.      Net total 59,565.

16  Q.      And what do we have on the second page of

17  Government's Exhibit 23?  What do we have here?

18  A.      October Finances Chapters.

19  Q.      And what does it state here?

20  A.      Zarzal.

21  Q.      And now I'm in page 4 of the translation of

22  Government's Exhibit 23.  What do we have at the

23  beginning of that page?

24  A.      Greetings, Associate Brothers.

25  Q.      At the second paragraph of that.

1    A.        Ñeta.

2    Q.        And what do we have here?

3    A.        Carlos Guaynabo, president.

4              MR. ACEVEDO-HERNÁNDEZ:  I have no further

5    questions, Your Honor.

6              MS. HILL-ADAMES:  None.

7              MS. LIZARRIBAR-MASINI:  None, Your Honor.

8              THE COURT:  Mr. González on behalf of

9    Mr. Casado-Berrios.

10             MR. GONZÁLEZ-DELGADO:  Yes, Your Honor.

11             THE COURT:  Please.

12                       CROSS EXAMINATION

13                            ---

14   BY MR. GONZÁLEZ-DELGADO:

15   Q.        Agent, referring to Government's ID -- it

16   should be --

17             MR. GONZÁLEZ-DELGADO:  It's been already

18   marked as an evidence.

19             THE COURT:  It is 23.

20   Q.        Regarding Exhibit 23, in this first page

21   there's no phone number put on this first page; is

22   that correct?

23   A.        That's correct.

24   Q.        There's no date put on this page either,

25   correct?

Daniel Cabrero - Cross

1   A.        (No response.)

2   Q.        You were the one who downloaded this, right?

3   A.        Not on that page.

4   Q.        Not on this one, right.

5             Now, this was a phone that was provided to

6   you by another person; is that correct?

7   A.        That's correct.

8   Q.        You didn't seize it.

9   A.        No.

10  Q.        And you were just following orders.

11  A.        Yes.

12            MR. GONZÁLEZ-DELGADO:  I have no further

13  questions, Your Honor.

14            THE COURT:  Anybody else on cross?  Any

15  redirect?

16            MR. ACEVEDO-HERNÁNDEZ:  No, Your Honor.

17            THE COURT:  Thank you, sir, you may step

18  down.

19            MR. ACEVEDO-HERNÁNDEZ:  So the next witness,

20  the United States calls Miguel Álvarez-Medina.

21            THE COURTROOM DEPUTY:  Please raise your

22  right hand.

23            Do you solemnly swear that the testimony

24  you're about to give in the case now before the Court

25  will be the truth, the whole truth and nothing but

1    the truth, so help you God?

2            THE WITNESS:  I do.

3            THE COURTROOM DEPUTY:  Thank you, sir,

4    please be seated.

5                              ---

6            MIGUEL ÁLVAREZ-MEDINA, a witness called on

7    behalf of the Government, having been duly sworn by

8    the Courtroom Deputy, was examined and testified as

9    follows:

10                      DIRECT EXAMINATION

11                              ---

12   BY MR. ACEVEDO-HERNÁNDEZ:

13   Q.      Sir, please state your name to the members

14   of this jury?

15   A.      Miguel Álvarez-Medina.

16   Q.      Sir, do you have any nickname?

17   A.      Witito.

18   Q.      Any other nickname?

19   A.      Pastor Miguel.

20   Q.      And how old are you?

21   A.      Thirty-eight.

22   Q.      Where were you born?

23   A.      Río Piedras.

24   Q.      What is the extent of your education?

25   A.      Senior year of high school.

Miguel Álvarez-Medina - Direct

1   Q.       What did you do after leaving school?

2   A.       I graduated in '97 from the Angel Pedro

3   Millán School.  And then I went to Carolina to study

4   at the vocational school Carlos F. Daniel, and I

5   studied as an electrician there.  And then I went to

6   work as an elevator technician in 1998 until 2008.

7   Q.       And what happened in 2007 in relation to an

8   individual known as Homisan?

9   A.       In 2008?

10  Q.       Yes.

11  A.       On April 29, 2008, at about noon I went to

12  pick up a person that I was raised with.  I decided

13  to study but he decided to go down the wrong path --

14          MR. GONZÁLEZ-DELGADO:  Objection.  I'm

15  waiting for him to finish, I'm sorry.

16          THE COURT:  That's okay.  What's the

17  objection?

18          MR. GONZÁLEZ-DELGADO:  I move to strike the

19  characterization of the other individual that the

20  witness is testifying about.

21          THE COURT:  All right.  I'm going to strike

22  that portion of the answer only.  You may continue.

23  BY MR. ACEVEDO-HERNÁNDEZ:

24  Q.       Sir, what happened on April 29, 2008?

25  A.       On April 29, 2008, I went to pick up

Miguel Álvarez-Medina - Direct

1    Homisan.  We went to see two attorneys; one attorney

2    at the state level, one attorney at the federal

3    level.  When we were on the way to his housing to

4    where he lives, he made a third threat because

5    previously he had made two threats that if I had --

6              MR. GONZÁLEZ-DELGADO:  Objection, Your

7    Honor.  This is -- I'm sorry, I have to wait for the

8    answer.  It's hearsay, Your Honor.

9    A.        -- that if I left his side he was going to

10   take my life, the life of my wife, and my 21-day born

11   son.

12             THE COURT:  Sustained.  Sustained as to the

13   hearsay.

14   BY MR. ACEVEDO-HERNÁNDEZ:

15   Q.        What did you do as a result of what he said?

16   A.        I took his weapon, since he was a fugitive

17   of justice, and I shot him in his face.

18   Q.        What happened to him?

19   A.        He died.

20   Q.        And what happened with that, with that

21   murder?

22   A.        On May 2, 2008, three days later, I made

23   peace with the Lord.

24             MR. GONZÁLEZ-DELGADO:  Objection.

25   Self-serving answer, Your Honor.

Miguel Álvarez-Medina - Direct

1    THE COURT:  Sustained.

2    Q.    What did you do --

3    MR. ACEVEDO-HERNÁNDEZ:  And, Your Honor, if

4    he can allow the translation to be completed

5    before --

6    THE INTERPRETER:  The interpreter did

7    everything.

8    THE COURT:  Correct.  So I have sustained

9    what I heard.  Continue, please.

10   BY MR. ACEVEDO-HERNÁNDEZ:

11   Q.    Sir, was the murder of Homisan charged

12   against you in state court?

13   A.    Yes.  I went directly to the CIC and I made

14   statements and I accepted the responsibility so that

15   the case would be solved.

16   Q.    And, sir, what happened with that state

17   court?

18   A.    I pled guilty as soon as possible.  I was

19   given 27 years; 15 for the murder, ten for Article

20   5.4 weapons law, and two years for Article 5.15 also

21   for weapons.

22   Q.    And on what date did you receive that

23   sentence?

24   A.    October 22, 2008.

25   Q.    And right now where are you living?

Miguel Álvarez-Medina - Direct

1    A.         MDC Guaynabo.

2    Q.         Were you charged in the Ñeta case?

3    A.         No.

4    Q.         And why are you in MDC?

5    A.         Material witness, and serving the state

6    sentence for the 27 years.

7    Q.         And why are you in MDC as a material

8    witness?

9    A.         Because of the case of the Ñeta group, of

10   the Ñeta association.

11   Q.         Sir, did you decide to cooperate with law

12   enforcement?

13   A.         Yes.

14   Q.         Why are you cooperating?

15   A.         First, because of justice, and then the day

16   that I met Prosecutor Victor Acevedo, an ex-federal

17   agent last name Cotto, asked me to ask for a

18   recommendation for reduction of my sentence.

19   Q.         And are you cooperating because you want a

20   reduction in your state sentence?

21   A.         Okay, I'm cooperating for a recommendation.

22   Q.         Has anyone made any promise to you that

23   federal authorities are in fact going to seek a lower

24   sentence in your state case?

25   A.         No one.  No one.

Miguel Álvarez-Medina - Direct

1    Q.       Who decides your state sentence?

2    A.       The state judicial court.

3    Q.       And what obligation, if any, do you have as

4    a government witness?

5    A.       Tell the truth.

6    Q.       Have you had any other problems with the law

7    in addition to the murder of Homisan?

8    A.       Never in my life.

9    Q.       Have you ever used drugs?

10   A.       No.  I've never smoked cigarettes or drank

11   or any type of controlled substances.

12   Q.       Sir, let's talk about the -- La Asociación

13   Ñeta.  Did you ever become a member of La Asociación

14   Ñeta?

15   A.       Yes.  I lived seven years and three months

16   in the Ñeta association.

17   Q.       And since when are you a member for the

18   organization?

19   A.       From May 4, 2008 which was when I was

20   incarcerated in 705.  I was only 16 days in 705.  I

21   was released on bond under pretrial services and from

22   October 22, 2008 until February 2, 2016 I belonged to

23   the Ñeta association.

24   Q.       And what did you do for the -- La Asociación

25   Ñeta?

Miguel Álvarez-Medina - Direct

1  A.        I was a member of the organization and at a

2  certain point I belonged to the dialog committee.

3  Q.        What is the dialog committee?

4  A.        The dialog committee is the pretty face of

5  the organization to talk to the administration.

6  Q.        And why do you say "the pretty face"?

7  A.        Because in the past when the association

8  first formed the dialog committee these were the

9  leaders, and the corrections administration would

10 identify who were the leaders.  And a certain point

11 on they put persons there that had a good image, that

12 they spoke well and they had an image when they were

13 talking and values so that they could give a good

14 image of the organization.

15 Q.        And do you know about the history of La

16 Asociación Ñeta?

17 A.        Yes.

18 Q.        How is it that you know?

19 A.        First it was taught to me by Modesto

20 Crisostomo a/k/a Modesto Sicardo, or Modo Sicardo.

21 He told me about the association, how it was formed

22 at the end of the seventies, beginning of the

23 eighties.  Since he lived at 308, he worked taking

24 the trash to the landfill.  There they would take the

25 motors of the washing machines to take them to the

Miguel Álvarez-Medina - Direct

1  institution, and then to tear off the metal of the

2  frames of the beds of litters, bunk beds, to make

3  knives and so they could use the knives in the fight,

4  the fight that ensued at 308 and the fight that

5  occurred between the group that later would be called

6  Ñetas and the group that was the 27s.

7  Q.      And, sir, this person that explained this to

8  you, the person you identified, was he a member of

9  the Ñeta organization?

10  A.      He was a member of the Ñetas and he was one

11  of the persons who fought and bled for the values and

12  ideals of the organization and he was in the free

13  community.  And he was freed because of Act 27 since

14  he had cancer --

15          MR. GONZÁLEZ-DELGADO:  Objection, Your

16  Honor.  Objection as hearsay.  And this is historical

17  way before he was a --

18          MR. ACEVEDO-HERNÁNDEZ:  Objection to him

19  arguing in front of the jury.

20          THE COURT:  Overruled.

21  A.      In 2010, he was revoked because he didn't

22  sign in with his social worker with whom he had to

23  report to, so I saw him when he was revoked in the

24  Annex 299 in Building 6.  But Buildings 6, 7 and 3

25  belonged to the Ñetas.

Miguel Álvarez-Medina - Direct

1    BY MR. ACEVEDO-HERNÁNDEZ:

2    Q.        And, sir, originally what was the Ñeta

3    organization about?

4    A.        Well, the Ñetas began with some ideals that

5    which the organization was first organized by Carlos

6    Torres-Iriarte, but then at the end of the eighties,

7    beginning of the nineties the ideals and values of

8    the Ñeta organization changed.

9            MS. HILL-ADAMES:  Objection, Your Honor.

10   He's talking -- giving an opinion about something

11   that happened back in the nineties when he said --

12           THE COURT:  Well, first of all, we heard --

13   I'll let you get a little bit of this in, we have

14   heard this already.  I'm going to sustain the

15   objection as to the characterizations.  If you could

16   keep moving if you would, please.

17   BY MR. ACEVEDO-HERNÁNDEZ:

18   Q.        Sir, in a nutshell what was the organization

19   originally about?

20   A.        Well, first the organization Ñeta it has its

21   two prongs.  The first part is the pretty face that

22   it was to supposedly fight for the rights of inmates;

23   and the second one a well-organized business to make

24   money.

25   Q.        And how is it that the La -- Asociación made

Miguel Álvarez-Medina - Direct

1    money?

2    A.        In different ways.  Collecting for the sale

3    of illegal cell phones.  Collecting for the

4    incentives of cell phones in the prison, and also

5    collecting for different controlled substances,

6    heroin, a drug which is cocaine, and marijuana.

7    Q.        And has the organization been involved in

8    murder?

9    A.        Yes.  Since the end of the seventies to the

10   present.

11   Q.        And more recently talking about in or about

12   the year 2014 what murders has the organization been

13   involved in?

14   A.        August 27, 2014, Mario Music or Mario M. was

15   killed.

16   Q.        And what other murder, if any, do you know

17   about?

18   A.        After that murder which was in August, in

19   the jail, in mid-September 2014, in mid-September

20   Bengie "El Gordo" arrived to 172 Building 1,

21   Section A in which Mario was killed and in which I

22   lived.

23   Q.        Sir -- I'm sorry, please continue.

24   A.        When the sanction ends, since we had been

25   locked up because a person had been killed, general

Miguel Álvarez-Medina - Direct

1    Bengie "El Gordo" was one of the pillars of the

2    organization, he met the membership.  So when the

3    membership meets then everybody stays quiet and

4    someone speaks.  So he spoke -- and I'm telling you

5    about this so -- leading you to the other deaths --

6    and he specified how the association began and how he

7    came in with a low sentence and how he got a life

8    sentence because he killed for the ideals of the

9    association.  And.

10         He told us that the maximum leadership, that

11   the organization had a profitable business because of

12   the contract murders that had occurred that he talked

13   to us about.  He talked about three deaths:  One in

14   Ponce, Alexis *"El Loco"*; Mario's death in Bayamón;

15   and then the 705.

16   Q.       And, sir, just Bengie "El Gordo" was he a

17   member of the -- La Organización Ñeta?

18   A.       Yes.

19   Q.       What role did he have in the organization or

20   what roles had he had?

21   A.       He had different roles and from the

22   beginning to the present he had been the maximum

23   leader for many years.  Then he simply was a member

24   of the Ñeta organization and currently he's in the

25   maximum leadership.

Miguel Álvarez-Medina - Direct

1   Q.      And, sir, did the organization have any

2   rules?

3   A.      Yes.

4   Q.      What would happen if you did not follow

5   them?

6   A.      You could die and then other persons they

7   ended up being quadriplegic because of not following

8   the rules and having been sanctioned.

9   Q.      And, sir, does the organization have a hand

10  gesture?

11  A.      Yes.

12  Q.      Which one is that?

13  A.      (Indicating.)

14          MR. ACEVEDO-HERNÁNDEZ:  And, just for the

15  record, the middle finger is on top of the index

16  finger.

17  Q.      And, sir, what would happen every day 30 of

18  the month?

19  A.      The scream was done.

20  Q.      Does the organization have a color?

21  A.      Yes.  White and blue.

22  Q.      And in general terms does the organization

23  have a leadership structure?

24  A.      Yes.

25  Q.      How is it structured?

Miguel Álvarez-Medina - Direct

1    A.        You have the maximum leadership, and the

2    maximum leadership is spread out through the

3    different jails in Puerto Rico of Ñeta chapters.

4    Then you have the central leadership and the floor

5    leadership.  The central leadership it's chosen from

6    within the jail and the floor leadership too,

7    different from the maximum leadership which is spread

8    out throughout all the jails and they are the

9    leadership in all the jails.

10             So you have the maximum leadership which is

11   the one who governs overall the Ñeta chapters, they

12   have meetings and they give orders to the leader --

13   central leadership, and the central leadership gives

14   instruction to whomever is the leadership of the

15   chapters or chapter boards.

16   Q.        And, sir, you mentioned to us that one of

17   the ways that the organization made money was through

18   the cell phone incentive; how did that work?

19   A.        There was a registry of the amount of

20   telephones per section and building in different Ñeta

21   chapters.  And there were persons that -- well, the

22   secretary had to keep account of all the cell phones

23   with the numbers and how many there were and the

24   owners of those cell phones so that once a month

25   they'd pay the incentive for having the phone inside

Miguel Álvarez-Medina - Direct

1    the institution.  And there were different ways of

2    paying and different prices depending on which

3    jail -- if it was a maximum, a medium or a minimum.

4    And maximum security the price was more expensive.

5    Medium, for example, in the 1007 it was $25 that was

6    charged.

7             MR. ACEVEDO-HERNÁNDEZ:  Objection to the

8    translation.

9    Q.       What prison did you say?

10   A.       1072 in Bayamón.

11            THE INTERPRETER:  The interpreter is

12   corrected.

13   A.       And the minimum it could be 20 to $25, it

14   depends.  And there was also another way if you

15   didn't have the $20 which was done through Western

16   Union.  It was the leadership's decision that you

17   could pay with a cigarette pack because a cigarette

18   pack was $20 in jail.

19            There was also an obligation every certain

20   amount of time that, when the leadership decided,

21   they would send lines of drugs.  In this case I'm

22   talking about heroin known as tecata.  That line we

23   would measure it and put in a ChapStick® cap and that

24   was known as line or a gram.  And that had to be

25   tallied to $200 to the leadership.  And that was used

Miguel Álvarez-Medina - Direct

1    if there was an activity for the jail and also to pay

2    the leadership.

3    Q.        Do you know how Westerns were used to pay

4    for the drug trafficking aspect of the drug

5    trafficking organization?

6    A.        Yes.

7            MS. HILL-ADAMES:  Your Honor, we have an

8    objection to this line of questioning.  This

9    defendant is not even indicted in this case, and the

10   questions that are being posed are related to the

11   allegations of this indictment.  He's a material

12   witness.  Unless...

13           THE COURT:  Overruled.

14   BY MR. ACEVEDO-HERNÁNDEZ:

15   Q.        And, sir, can you explain to the members of

16   this jury how is it that Westerns were used for the

17   drug trafficking aspect of the organization?

18   A.        Yes.  There was a drug dealer and the

19   customer that's going to buy a certain amount of

20   substance, for example, who was going to buy four

21   pichis.  A pichi, that's a small square.  And a line

22   would be divided among 35 to 36 pichis, but from the

23   36 two of them would be the incentive of the pot.

24   And just so you understand I'm talking about the

25   personal drug.  So those two would be paid to the

Miguel Álvarez-Medina - Direct

1     incentive.  The other four or three it would be paid

2     to the people who worked the table and the other 30

3     would be sold at $10 each.  And that's how you'd get

4     approximately $300.

5           So if a person would come to buy four pichis

6     then it was $40.  And just as an -- using me as an

7     example, if I were to buy from you that you're the

8     drug dealer --

9           MS. HILL-ADAMES:  Objection, Your Honor,

10    giving examples of something that is not part of the

11    question that is being posed.

12          THE COURT:  Sustained, it's beyond.  I'll

13    let you break it down, please.

14          MR. ACEVEDO-HERNÁNDEZ:  Okay.

15    BY MR. ACEVEDO-HERNÁNDEZ:

16    Q.      Can you explain how is it that money would

17    be transferred from the buyer to the seller using

18    Western Unions?

19    A.      Okay.  The person that was going to directly

20    purchase, give the information to the person, they

21    would call their family member and would say, Make a

22    Western Union of $40, or whatever amount it was with

23    the information that was given so that then the drug

24    dealer -- so that relative or friend that he had in

25    the free community could pick up the Western Unions

Miguel Álvarez-Medina - Direct

1  of the daily sales that were done of a maximum of

2  $9,999.  It wouldn't go above that because the Ñeta

3  association had noticed that after the $10,000 then

4  the person of the Westerns would be detected.

5  Q.        And, sir, how do you know all this?

6  A.        Through Carlos Carrión a/k/a Carlitos

7  Vieques who was the one who taught me all of that.

8  Q.        And is that person a member of the Ñeta

9  organization?

10 A.        Currently I believe that he's on bond in the

11 free community --

12          MR. GONZÁLEZ-DELGADO:  We have an objection.

13          MR. ACEVEDO-HERNÁNDEZ:  His translation has

14 to come through.

15          THE COURT:  What's the answer?

16 A.        Currently he's anyways a member in the free

17 community.

18          MR. GONZÁLEZ-DELGADO:  Objection as to 602

19 and hearsay, Your Honor.

20          THE COURT:  Come up.

21          (Sidebar discussions begin.)

22          THE COURT:  What part is hearsay?  He just

23 said he knew him.

24          MR. GONZÁLEZ-DELGADO:  But one thing is

25 knowing him and the other thing is that he's saying

Miguel Álvarez-Medina - Direct

1    that somebody told him that's not a Ñeta member --

2          MR. ACEVEDO-HERNÁNDEZ:  That's not what he

3    said.

4          THE COURT:  Through me, please.

5          MR. ACEVEDO-HERNÁNDEZ:  Sorry, Your Honor.

6          THE COURT:  I just heard him say he was a

7    Ñeta only member on the street.

8          MR. GONZÁLEZ-DELGADO:  I didn't get that

9    part, Your Honor.

10          MR. ACEVEDO-HERNÁNDEZ:  That's what I heard

11    also, Your Honor.  That's what's on the record, we

12    can check.

13          THE COURT:  Do you mind if I be the judge

14    here?  Thank you.

15          MR. GONZÁLEZ-DELGADO:  What I heard, Your

16    Honor, was that he was going to state that he heard

17    this from an individual who actually is out on the

18    street, but they didn't give the answer that he was a

19    Ñeta member.

20          THE COURT:  I heard him say that.  I'll ask

21    Mr. Acevedo to do that.

22          MR. ACEVEDO-HERNÁNDEZ:  And if I may, Your

23    Honor.

24          THE COURT:  Please.

25          MR. ACEVEDO-HERNÁNDEZ:  He keeps objecting

Miguel Álvarez-Medina - Direct

1    that co-conspirator statements require personal

2    knowledge.  It's settled even in the advisory

3    committee notes that co-conspirator statements are

4    specifically exempted from Rule 602, and if the Court

5    needs the case we can cite it.  So we find that

6    objection to be improper.

7            MR. GONZÁLEZ-DELGADO:  Your Honor, what I

8    am -- when I object those statements it's because the

9    individuals that are allegedly stating that are not

10   Ñeta members, they are not indicted and there's no

11   relation between.

12           THE COURT:  I think there's a difference

13   between those that are Ñeta members because I think

14   those would be co-conspirators.  Whether they're

15   indicted or not I don't think I care.

16           MR. GONZÁLEZ-DELGADO:  But my objection has

17   been when they've been testifying that these are

18   individuals that are not Ñeta members.

19           THE COURT:  If they're not Ñeta members

20   then --

21           MR. GONZÁLEZ-DELGADO:  That's why I've been

22   objecting.

23           MS. HILL-ADAMES:  I want to supplement.  He

24   said at the end that he knows all of these drug

25   intricacies because Carlos told him.  And when they

Miguel Álvarez-Medina - Direct

1  asked him, When did you meet up with Carlos?  He

2  said, Carlos is a Ñeta but he's on bond.  So they

3  have to establish if he was in prison with Carlos, if

4  Carlos has been on bond since when.  When was the

5  last time you saw him.  He's been at MDC for three

6  years.

7          THE COURT:  If he knows him and he knows

8  he's a Ñeta member why do I care when he got the

9  info?

10          MS. HILL-ADAMES:  But we have to see if

11  Carlos was really in prison with him, Your Honor.

12          THE COURT:  So what?  What if he got it from

13  someone else?

14          MS. HILL-ADAMES:  Then maybe it's not a

15  co-conspirator statement.

16          THE COURT:  Well, maybe but --

17          MR. GONZÁLEZ-DELGADO:  The statement has to

18  be made in furtherance of the conspiracy.  And if

19  this individual is already out of the conspiracy

20  either because he already served his time or he's on

21  bond or whatever, those statements are inadmissible

22  because they're not made in --

23          THE COURT:  As long as it's made during the

24  course of and in the furtherance of it's in.

25          MS. HILL-ADAMES:  And he's been in Guaynabo

Miguel Álvarez-Medina - Direct

1    for the last three years.

2           THE COURT:  So let's move, let's lock this

3    down.

4           (Sidebar discussions end.)

5           MR. ACEVEDO-HERNÁNDEZ:  May I, Your Honor.

6           THE COURT:  Please.

7    BY MR. ACEVEDO-HERNÁNDEZ:

8    Q.      Sir, I was asking you how you knew what you

9    just explained to us and you mentioned the name of

10   that person; can you mention the name again?

11   A.      Carlos Carrión a/k/a Carlos Vieques.

12   Q.      When Carlitos Vieques mentioned this to you

13   at that time was Carlitos Vieques a member of the

14   Asociación Ñeta?

15   A.      Yes, and he was with me in the 1072 in

16   Bayamón.

17   Q.      Sir, continuing to speak of the drug

18   trafficking aspect of the organization, can you

19   explain to us what pichi mean?  You were using the

20   term "pichi" earlier, what does that mean?

21   A.      Yes, in the association.

22   Q.      That's okay.  You don't need to demonstrate

23   it.  Just explain it to the jury.

24   A.      I was going to use a little piece of

25   something to explain.  Plastic baggies would be cut,

Miguel Álvarez-Medina - Direct

1     the wrappings of Frosted Flakes or of chocolate chip

2     cookies or oatmeal cookies which was a type of

3     aluminum foil, and it would be cut approximately this

4     size.  So that then you had the supervisor of the

5     substance to deck the heroin so it would be divided

6     in different amounts according to the spoon.  The

7     tool is a piece that's used that they are scraping it

8     to have the measurement of the pichi.

9            When they have the heroin in the spoon they

10    put it in the piece of plastic, they fold it and you

11    have a small square.  That's a pichi.  And the pichi

12    was the amount of substance that you were sold.  In

13    the free community that would be -- they would be

14    called a baggy.  But since this is small it's called

15    a pichi.

16    Q.     And, sir, what kind of drugs did the

17    organization distribute?

18    A.     Heroin, cocaine, marijuana.

19    Q.     And how do you know that?

20    A.     Because on several occasions I saw -- in

21    1072 and 448 I saw them decking.

22    Q.     And do you know how is it that drugs came

23    into prison?

24    A.     Yes.  Through the pitch-ins, through visits,

25    through officers, nurses, and sometimes Positronic

Miguel Álvarez-Medina - Direct

1    employees.  Positronic is a company, it's a computer

2    company that was established inside corrections.  And

3    one of the employees of Positronic was the one that

4    introduced the drugs into Ponce 1000.

5    Q.      And, sir, can you tell the members of this

6    jury in which prisons you have lived.

7    A.      Of course.  Since October 22, 2008 until

8    December 7, 2010 I was in Annex 292 in Bayamón.  I

9    was transferred on December 7, 2010 to the Ponce

10   adult annex -- Ponce adult 1000 until the summer of

11   2013 where I'm transferred to 1072 in Bayamón until

12   December 17, 2014.

13          And on December 17, 2014, I am transferred

14   to Phase 1 in Ponce until the end of May 2015 where

15   I'm transferred to Annex 448 in Bayamón until

16   September 1, 2015 that I'm transferred to the

17   university center of corrections which is known as

18   the corrections university until February 6, 2016

19   that I'm incarcerated in MDC Guaynabo.

20   Q.      Sir, and while you were in the correctional

21   institutions and Ponce and Bayamón, do you know if

22   certain areas or units were separated by gang

23   affiliation?

24   A.      Yes.  For example, Ponce 1000 there were two

25   sections that were maximum security that were Ñeta

Miguel Álvarez-Medina - Direct

1  and at a certain point two sections of medium

2  security.  There were five sections of 27, two of

3  group 25; one of 31s; and one of security and 25, the

4  old group.

5          In Bayamón 1072, the Ñetas had Buildings 1,

6  2, 4 and 5.  Building 6 belonged to the 27s, and

7  Building 3 was a methadone and psychiatric program.

8  Q.      Sir, and if I showed you pictures of the

9  Ponce correctional institution would you be able to

10  recognize it?

11  A.      Yes.

12  Q.      Sir, I'm going to show you what has been

13  previously marked as Government's Exhibit 6 through

14  15.  Please tell me of those -- I'm going to show you

15  Government's 6 through 15 and I'm just going to ask

16  you to give me the ones that you are able to

17  recognize.

18  A.      Okay.

19  Q.      Without explaining just tell me which

20  numbers you recognize.

21  A.      No. 6 (Handing.) --

22          THE COURT:  You know what, why don't we do

23  this.  Why don't we take an afternoon break and we'll

24  see you back here in about 20 minutes.

25          THE BAILIFF:  All rise.

Miguel Álvarez-Medina - Direct

1          (The Jury exits the room.)

2          THE COURT:  Counsel help me out just an

3   issue that I'm confused on.  So when the witnesses

4   are using the number, the 1072 or whatever, what does

5   that refer to?

6          MR. ACEVEDO-HERNÁNDEZ:  A specific section

7   within the correctional institution because each --

8   like, for example, if we use this for an example

9   which is Bayamón, they're sections like -- I believe

10  this is 1072.  292 would be around here.  So it's

11  like sections of the same institution.

12         THE COURT:  I see.  It's sort of like an

13  address within the institution?

14         MR. ACEVEDO-HERNÁNDEZ:  Exactly.

15         THE COURT:  Thank you.  See you in 20.

16         THE BAILIFF:  All rise.

17         (The Court exits the room.)

18         (Jury trial recessed at 2:43 p.m. and

19  resumed at 3:11 p.m.)

20         (The Court enters the room.)

21         MS. HILL-ADAMES:  Your Honor, I have a

22  hearing at 4:30.  I filed a waiver, and I've asked

23  Mr. Flaquer to assist me by printing the waiver that

24  I sent to him so I can get that out of the way.

25         MR. ACEVEDO-HERNÁNDEZ:  Your Honor, there is

Miguel Álvarez-Medina - Direct

1    a 404(b) issue with this witness should we discuss it

2    with you at sidebar.

3              THE COURT:  I wish you guys had told me that

4    before.  I just had the jury called.

5              MR. ACEVEDO-HERNÁNDEZ:  Sorry.

6              THE COURT:  How soon before you're going to

7    get to it?

8              MR. ACEVEDO-HERNÁNDEZ:  It's coming up.

9              THE COURT:  When you get to it, come up.

10             MR. ACEVEDO-HERNÁNDEZ:  I want to make sure

11   he doesn't go into that -- why don't you come over

12   now.

13             (Sidebar discussions begin.)

14             THE COURT:  So what's the -- what is the

15   witness going to say, first of all?

16             MR. ACEVEDO-HERNÁNDEZ:  He's going to say

17   that Viejo Ten, her client, was a member of the Ñeta

18   gang, a pillar for the organization, et cetera,

19   et cetera talking about the pillar aspect; but at

20   some point he can say that he became a pillar because

21   he killed for the ideals that -- he became a pillar

22   because he killed for the ideals of the organization.

23             THE COURT:  What's his basis of knowledge?

24             MR. ACEVEDO-HERNÁNDEZ:  He was told by Ñeta

25   leaders in seminars.

Miguel Álvarez-Medina - Direct

1       MS. HILL-ADAMES:  Same thing.

2       MR. ACEVEDO-HERNÁNDEZ:  He knows because --

3   maybe since he has such a good memory, he can even

4   say --

5       MS. HILL-ADAMES:  You're vouching for the

6   witness, Counsel.

7       MR. ACEVEDO-HERNÁNDEZ:  If maybe the Court

8   wants maybe I can ask him and maybe we can lay a good

9   foundation.  Maybe that can make a difference.

10      THE COURT:  I'll need a foundation and then

11  once you get to that point let's come up.

12      MS. HILL-ADAMES:  Your Honor, it's the same

13  testimony that you've already excluded from Alex

14  Cuquito.  It's the same testimony that Judge

15  Pérez-Giménez excluded from González-Gerena.  And,

16  even worse, this guy came into prison in 2008 so he's

17  even a newer Ñeta member.  The other ones have been

18  in prison since the early nineties so maybe they even

19  had more chance to even find that out or corroborate

20  that and even do time with Viejo Ten.  The same

21  objection --

22      THE BAILIFF:  All rise.

23      (The Jury enters the room.)

24      THE COURT:  The issue though wasn't that as

25  much as it was he forget -- the other guy, the last

Miguel Álvarez-Medina - Direct

1    guy that testified didn't remember who told him and

2    when he told him.

3         MS. HILL-ADAMES:  Your Honor, he doesn't

4    know --

5         THE COURT:  Let me hear the answers.

6         MS. HILL-ADAMES:  But we have to do that

7    outside the presence of the jury.  I can't

8    cross-examine him.  It's the same 404(b) argument.

9    It's when?  How?  Who?  Any reports?  It's the same

10   argument, Your Honor.

11        MR. ACEVEDO-HERNÁNDEZ:  It was provided in a

12   report.

13        MS. HILL-ADAMES:  No, no, no, I'm saying as

14   to the deaths that he's saying that he knows about.

15        THE COURT:  Lay the foundation and then when

16   you get there don't mention names.  Lay the

17   foundation.

18        MR. ACEVEDO-HERNÁNDEZ:  I'll do what the

19   Court instructs.  But, Your Honor, my concern is

20   Ms. Anita Hill is going to love to say mistrial, so I

21   want to avoid any of that.  So if preferably the

22   Court allows, can we do a quick 104 hearing without

23   the presence of the hearing so we can try to lay --

24   it will be short.  It will be like two questions.

25   Later not now.

Miguel Álvarez-Medina - Direct

1    THE COURT:  All right, let's move.

2    MR. ACEVEDO-HERNÁNDEZ:  Okay.

3    (Sidebar discussions end.)

4  BY MR. ACEVEDO-HERNÁNDEZ:

5  Q.    Sir, have you had a chance to look at

6  Government's Exhibit 6 through 15?

7  A.    Do I mention them?

8  Q.    Just tell me which of those numbers would

9  aid your testimony.

10  A.    No. 7, No. 9, No. 12, No. 15.

11  Q.    I'm showing you what has been marked as

12  Government's Exhibit 7.

13  A.    Yes.

14  Q.    What areas -- do you know what areas that

15  depict?

16  A.    Yes.

17  Q.    What areas?

18  A.    The Phase 1 part of the prison in Ponce.

19  Q.    Do you recognize any other part of the Ponce

20  institution depicted in that photograph?

21  A.    Yes.  All of this part together with Phase 1

22  they call it Ponce main.

23  Q.    Sir, do you know if any of those areas had

24  Ñeta presence?

25  A.    Yes.

Miguel Álvarez-Medina - Direct

1  Q.      Which ones?

2  A.      Phase 1, Phase 4, and 5.

3  Q.      Can you touch those areas.

4  A.      Phase 1, Phase 4, and Phase 5.

5          MR. ACEVEDO-HERNÁNDEZ:  Your Honor, can we

6  get a printout of that.

7          THE COURT:  What did you want?

8          MR. ACEVEDO-HERNÁNDEZ:  The system can print

9  out the photos with the marking.

10          THE COURT:  All right.  Yes, you may.  Keep

11  moving.  We're printing.

12  Q.      Sir, does this Government's Exhibit 7 show

13  the area in which pitch-ins occur?

14  A.      If in Exhibit 7 in the picture it shows the

15  areas of the pitch-ins?

16  Q.      Yes, that's my question.

17  A.      Yes.

18  Q.      Can you mark it.

19  A.      For phase they would pitch in this area, for

20  the part of the woods.

21  Q.      Do you recognize any other part that was

22  used for pitch-ins?

23  A.      At least during the time that I was in

24  Phase 1 that was the part that was used.

25          THE COURT:  Take a look, tell me what you

Miguel Álvarez-Medina - Direct

1    think.

2         MR. ACEVEDO-HERNÁNDEZ:  That's what it is.

3    7-A.

4         THE COURT:  Yes.  Exhibit 7-A.

5    Q.      I'm showing you Government's Exhibit 12; do

6    you recognize what that area depicts?

7    A.      Yes.

8    Q.      Which areas do you recognize?

9    A.      Annex Ponce adult 1000.

10   Q.      Any other area?

11   A.      I recognize Ponce 500 and the Green Monster.

12   Q.      Do you know if in any of those areas there

13   was Ñeta presence?

14   A.      Yes.

15   Q.      Which areas?

16   A.      In Ponce 1000, maximum and medium.  At a

17   certain point in 2011 medium was taken to Ponce 500.

18   And in the monster there are certain areas that are

19   Ñeta.

20   Q.      Can you just mark the areas that have Ñeta

21   presence.

22   A.      At the time that I was there, here's

23   maximum, here was medium of Ponce 1000.  Then while I

24   was there the corrections administration did a change

25   in the buildings because of the situation with the

Miguel Álvarez-Medina - Direct

1    27s in 2012, that there was a war that ensued, they

2    put maximum here and mediums were in Ponce 500 since

3    2011.  Then eventually another medium was filled with

4    Ñetas.

5              MR. ACEVEDO-HERNÁNDEZ:  And can we have a

6    printout for 12-A.

7              THE COURT:  All right.  You may clear.

8    Q.        Sir, I'm showing you what's been marked as

9    Government's Exhibit 16; do you recognize that?

10   A.        That's the Bayamón complex.

11   Q.        And, sir, can you mark for us -- do you know

12   if there were Ñeta areas in the Bayamón complex?

13   A.        Yes.

14   Q.        Can you mark them for the jury please?

15   A.        Yes.  Annex 292, which is this one here,

16   Building 3 which is this one, Building 6 which is

17   this one, and 7 which is this one.  1072 which is

18   this one.  Building 1 which was where Mario's death

19   occurred, which was here.  Building 2, this one;

20   Building 4, this one; and Building 5, this one.

21   Q.        And, sir --

22             MR. ACEVEDO-HERNÁNDEZ:  And I'll keep asking

23   questions but meanwhile can we get a printout of

24   Government's Exhibit 16 marked 16-A.

25   Q.        Sir, in Bayamón in that picture,

Miguel Álvarez-Medina - Direct

1    Government's 16 do, you know where pitch-ins

2    occurred?

3    A.       Yes.  Should I mark them?

4    Q.       Yes.

5    A.       Here.

6             MR. ACEVEDO-HERNÁNDEZ:  And, Your Honor,

7    we'll ask also a printout of that 16-B and we would

8    continue to ask questions.

9             THE COURT:  Don't clear it.

10   Q.       Sir, do you see --

11            MR. ACEVEDO-HERNÁNDEZ:  May I continue, Your

12   Honor.

13            THE COURT:  Yes, please.

14   Q.       Sir, do you see anyone here present today in

15   court that was a Ñeta member while you were a Ñeta

16   member?

17   A.       Yes.

18   Q.       Can you please stand up and identify each

19   one and tell the members of this jury the clothing

20   that they're wearing.

21   A.       Of course.  The first one is Rolando

22   Millan-Machuca a/k/a Rolo, he's wearing a long

23   sleeved white shirt, and he's on the right side of

24   Attorney Lydia Lizarribar who just took off her red

25   glasses.

Miguel Álvarez-Medina - Direct

1    MR. ACEVEDO-HERNÁNDEZ:  For the record, the

2  witness has identified Rolando Millan-Machuca also

3  known as Rolo, Your Honor.

4    THE COURT:  So noted.

5  Q.    Who else do you recognize?

6  A.    And there's -- after Rolo there's an

7  attorney and then Giordano who is Viejo Ten.  And

8  from where I am to the table and the third person is

9  Miguel Rivera-Calcaño who has a navy blue jacket with

10  a tie that has white dots on it, known as Guelo

11  Kikirimiau or Guelo Rio Grande.

12    MR. ACEVEDO-HERNÁNDEZ:  For the record, Your

13  Honor, the witness has identified Giordano

14  Santana-Meléndez also known as Viejo Ten and Miguel

15  Rivera-Calcaño also known as Guelo Kikirimiau or

16  Kikirimiau.

17    THE COURT:  So noted.

18  Q.    Sir, starting out with Miguel Rivera-Calcaño

19  Guelo, Kikirimiau, you mentioned that he was a member

20  of La Asociación Ñeta; what role did he have for the

21  organization?

22  A.    Guelo was in different roles during the

23  years that I was there in the Ñeta organization.

24  Q.    Please explain it to the jury.

25  A.    Okay.  Guelo, Kikirimiau for some years

Miguel Álvarez-Medina - Direct

1    belonged to the dialog committee, was a leader in the

2    dialog committee.  Then, when he was transferred to

3    the Ponce adult 1000 institution, which was a route

4    from 1072 to Ponce 1000 when Billy "El Calvo" left,

5    he remained there as leader; and then Guelo,

6    Kikirimiau when he arrives to 1072 he gets the second

7    position of the dialog committee once again.

8            Then when I arrived to 448 he was collecting

9    the incentive for the drugs for the maximum

10   leadership of the Ñetas.

11   Q.      Sir, let's start off with Ponce 1000.  You

12   said that he was a leader there?

13   A.      Yes.  When he was transferred approximately

14   at the end of the -- the end of 2012, beginning 2013

15   approximately he arrived together with a route of

16   medium from 1072 Bayamón.

17           And since Billy "El Calvo" and Miguel

18   Calcaño had the trust of the maximum leadership they

19   were put there as leaders since before them there

20   were leaders only there of maximum because previously

21   there had been medium in Ponce 1000 and then they

22   were moved to Ponce 500.  And for mediums since

23   you're in medium custody it's easier to get into the

24   kitchen and use the kitchen to do the transactions

25   and take the drugs from module to module.

Miguel Álvarez-Medina - Direct

1    And Miguel Calcaño, approximately after he

2  arrived, took that position approximately a month,

3  month and a half which was approximately the time

4  that Billy "El Calvo" was in Ponce 1000 until the

5  time that I left from Ponce 1000, transferred to 1072

6  in the summer of 2013.

7  Q.    While you were there with Kikirimiau at

8  Ponce 1000, what did he do, if anything, as a leader

9  there?

10  A.    He organized and got the jail in order to be

11  able to do the transactions and take them from module

12  to module.

13  Q.    The transactions of what?

14  A.    Of heroin, marijuana, cocaine.  He did this

15  through the kitchen to put it in the pot.  And the

16  pot is what we know as the jail's money, so to put it

17  up-to-date.

18  Q.    And how do you know that?

19  A.    Because I lived there.  When he arrived he

20  got into 4-T and 4-B and I was in 3-B.  I worked in

21  the commissary and working in that position

22  commissary I would go to all the modules, the 27s,

23  the 25s, the Ñetas, and security.  And by doing that

24  I had the opportunity to speak to all my fellow Ñetas

25  brothers, as well as be in the meetings of the Ñetas

Miguel Álvarez-Medina - Direct

1    in medium and maximum that were held there, which are

2    held in the court and in the baseball park in Ponce

3    1000.

4    Q.        In Ponce 1000, what role, if any, did he

5    have with the incentive?

6    A.        He put order and put a person to collect the

7    incentive.

8    Q.        And what incentive is that?

9    A.        The controlled substances incentive and of

10   the phones.

11   Q.        And can you explain how that worked in Ponce

12   1000 with Kikirimiau, Mr. Miguel Rivera-Calcaño, the

13   incentive?

14   A.        He responds to the maximum leadership of a

15   listing that they have to do for the amount of

16   phones.  And the chip here is counted because a

17   person can have one phone but two or three chips and

18   the person has to pay the incentive for the chip.

19            And within the organization there was a

20   secretary who has to write down all the drugs that

21   come in, if it's personal or from the leadership, but

22   the personal drugs is the one that paid incentives.

23   Q.        And, sir, you mentioned that you were

24   transferred out of Ponce 1000, where did you go next?

25   A.        I went to Bayamón 1072, Building 1,

Miguel Álvarez-Medina - Direct

1    Section A.

2    Q.        And when is the next time that you see

3    Miguel Rivera-Calcaño also known as Kikirimiau?

4    A.        After several months he arrived to 1072.

5    Q.        Please continue.

6    A.        Well, he was put there as Leader 2 and --

7              MR. VÉLEZ-GOVEO:  Objection, Your Honor.

8    This testimony is based on speculation.

9              THE COURT:  I'm going to sustain that, but

10   I'll ask you to just lay a foundation.  I'll let you

11   go there but please lay a foundation.

12             MR. ACEVEDO-HERNÁNDEZ:  Okay.

13   BY MR. ACEVEDO-HERNÁNDEZ:

14   Q.        How do you know that Miguel Rivera-Calcaño

15   arrived to the 1072 in Bayamón?

16   A.        Because I was put in the leadership of the

17   dialog committee, and they also put leader one who

18   was Castoide and Leader 2, Miguel Rivera-Calcaño,

19   also known as Kikirimiau.

20   Q.        Were you in the same prison with Miguel

21   Rivera-Calcaño in the 1072?

22   A.        Yes.

23   Q.        And when he is put as the second in command

24   of the 1072, what does he do, if anything, for the

25   organization there?

1    A.       Leader of the dialog committee.  He would

2    give us instructions on what to advocate for for each

3    one of the inmates.  But that gave him a benefit, so

4    every time he would go to a meeting with the

5    corrections administration he would go to Building 1,

6    2, 4, 5 and state what he had talked about.

7             MR. VÉLEZ-GOVEO:  Objection, Your Honor,

8    motion to strike based on hearsay.

9             THE COURT:  Overruled.

10   A.       And among the roles that he had as

11   leadership in the dialog committee he would collect

12   drugs, cigarettes or canned goods, and that's the

13   same thing he did when he went to building one,

14   Section A.  Since in the pod that I lived in 103

15   there was people from the central leadership, Agosto

16   Christopher Lee lived there, alias also known as

17   Bengie Loiza, and Bengie Loiza was the leader of the

18   whole building, of Building 1.  And Bengie and Tito

19   Grande who was --

20            MR. VÉLEZ-GOVEO:  Objection, Your Honor.

21            THE COURT:  Sustained, not responsive.  Next

22   question please.

23   BY MR. ACEVEDO-HERNÁNDEZ:

24   Q.       How is it that you know that Miguel

25   Rivera-Calcaño would charge drugs, cigarettes as you

Miguel Álvarez-Medina - Direct

1    had just mentioned that he did?  How did you know

2    that in 1072?

3    A.          And canned goods.

4    Q.          And canned goods.  How do you know that he

5    did all that in 1072?

6    A.          Because the person who gave the order to the

7    secretary about what the drugs they were going to

8    give, cigarettes or canned goods, did it in my pod.

9    Q.          And, sir, you mentioned that you know of

10   what he did in the 448 in Bayamón.

11   A.          Yes.

12   Q.          How is it that you know that?

13   A.          Because of Carlos Carrión a/k/a Carlitos

14   Vieques.

15   Q.          And is this the same Carlitos Vieques which

16   you previously talked to us about?

17   A.          Yes.

18   Q.          And what did Carlitos Vieques tell you about

19   him in the 448 in Bayamón?

20          MR. VÉLEZ-GOVEO:  Objection, Your Honor,

21   hearsay.

22          THE COURT:  Overruled.

23   A.          That he was -- that he was put to collect

24   the incentives for the drugs.  And what I mean the

25   drugs I'm talking about the drugs for the association

Miguel Álvarez-Medina - Direct

1    of the controlled substances for the maximum

2    leadership.

3    Q.       And, sir, you also identified for the jury

4    Mr. Rolando Millan-Machuca also known as Rolo; do you

5    know what role he had in the organization?

6    A.       He was part of the maximum leadership of all

7    the Ñetas in all the jails.

8    Q.       And how do you know that?

9    A.       Because a flow chart, an organizational

10   chart is passed, a paper, which at night they call

11   the secretary of each chapter and he's told whatever

12   the positions of the maximum leadership and the

13   maximum leadership's duties in all the jails.  Then

14   it's called for a meeting and each inmate is read the

15   positions and the roles of the maximum leadership, in

16   this case Rolando Millan-Machuca.

17   Q.       And did you hear this?

18   A.       They would say that for the whole

19   membership, not just for me but for all of us.

20   Q.       Do you know if as a maximum leadership he

21   was involved in drug trafficking?

22   A.       Yes.  The complete maximum leadership.  And

23   this gets us up to February 2, 2016 that I arrived to

24   MDC; he was the advisor of the maximum leadership.

25   Q.       Were you ever incarcerated at the same

Miguel Álvarez-Medina - Direct

1    prison as him?

2    A.        Ponce 1000.

3    Q.        And what, if anything -- do you know what he

4    did for the organization in Ponce 1000?

5    A.        In Ponce 1000 he took command since Tito

6    Grande, Joseph De Leon, was the leader of the jail

7    with Nieves, but when he arrived because of the trust

8    that he had he remained with the control of Ponce

9    1000.

10   Q.        And do you know if he had any involvement in

11   drug trafficking within that prison?

12   A.        Yes.

13   Q.        Please explain that, how so, to the members

14   of the jury.

15   A.        There were three pathways.  And the pathways

16   are the people who bring in the controlled substances

17   to the jail:  Officer Almodóvar, Officer Moreno, and

18   the Positronic employee.  When the shipments are

19   passed and if it's in Positronic for the employee who

20   is in charge to pick it up and give it to the

21   employee in Positronic who then divides them, gets it

22   to the unit and divides them.  And the officers who

23   would bring in the substances it all depended on the

24   situation, the security that there was in the

25   institution.

Miguel Álvarez-Medina - Direct

1      They could take it to Section 44-Q which was

2 the one that he was in, 4-R which were other Ñetas

3 that were there before he arrived, or the two maximum

4 units that were there.  So that then after it was

5 divided they would be taken throughout the whole jail

6 by the carriers.  And the carriers are the people who

7 take the food throughout the sections.  And in the

8 jail, well, the kitchen which was the main

9 distribution point for the jail.

10 Q.      And do you know which officer, if any,

11 Rolando Millan-Machuca used to enter drugs?

12 A.      La Asociación, not only him.  Officer

13 Almodóvar and Officer Moreno.

14 Q.      Sir, while you were a member of the La

15 Asociación Ñeta did the La Asociación Ñeta ever go to

16 war with the 27s?

17 A.      In 2012.

18 Q.      And do you know if Rolo had anything to do

19 with that?

20 A.      Well, he was already in Ponce 500, and he

21 had communication with Barrio, who was the one who

22 remained there as leader, and with Carlos Cruz-Lugo.

23 Carlos Cruz-Lugo was a leader who was in the section

24 that I was in and the order was given to go to war

25 with the 27s.

Miguel Álvarez-Medina - Direct

1    And my section it was a Christian module

2    since I was a pastor of Ponce 1000, we were 15 Ñetas

3    and nine 27s; and the order was given to get the nine

4    27s that were there out of the unit.  And Carlos Cruz

5    gave the order and some knives were prepared and they

6    took out and got the nine 27s out of the module.

7    Q.    And what, if anything, did Rolando

8    Millan-Machuca have to do with that?

9    A.    In giving the order.

10   Q.    And how do you know that he gave the order?

11   A.    Because Carlos Cruz-Lugo informed that to

12   me.  Just like the other 13 Ñetas that were in that

13   section.

14   Q.    And is Carlos Cruz-Lugo a member of the La

15   Asociación Ñeta?

16   A.    Up to when I was in the Ñetas, yes.

17   Q.    Sir, while you were incarcerated and a

18   member of La Asociación Ñeta did you hear of a person

19   that went by the nickname Bobe?

20   A.    Before being in jail and after I was in

21   jail.

22   Q.    And, sir, I want you to talk to me only what

23   you know since you were a member of La Asociación

24   Ñeta, nothing before that.

25   A.    Okay.

Miguel Álvarez-Medina - Direct

1  Q.      While you were a member of La Asociación

2  Ñeta how is it that you heard of Bobe?

3  A.      Because of the inmates that would come from

4  Zarzales and go into 1072.

5          MR. GONZÁLEZ-DELGADO:  Objection as to

6  hearsay, Your Honor.

7          THE COURT:  Well, I'm going sustain that.

8  I'll let you go there.  That was also nonresponsive.

9  BY MR. ACEVEDO-HERNÁNDEZ:

10  Q.      Sir, how is it that you know of Bobe while

11  you were a member of La Asociación Ñeta?

12  A.      Because of the same inmates that were coming

13  from the institution that he was in.

14          MR. GONZÁLEZ-DELGADO:  Objection, move to

15  strike.  It's hearsay, Your Honor.

16          THE COURT:  Well, I'm going to let that

17  stand.  I'm going to ask you to please drill down.  I

18  don't understand what that means answer means.

19          MR. ACEVEDO-HERNÁNDEZ:  I will, Your Honor.

20  BY MR. ACEVEDO-HERNÁNDEZ:

21  Q.      You mentioned that you knew or heard of Bobe

22  from inmates that came from Zarzales; were those

23  inmates members of La Asociación Ñeta?

24  A.      Yes.

25  Q.      And do you know if those inmates that came

Miguel Álvarez-Medina - Direct

1    from Zarzales that you mentioned were members of La

2    Asociación Ñeta had been incarcerated with Bobe?

3    A.        Yes.

4              MR. GONZÁLEZ-DELGADO:  Objection, Your

5    Honor, it's hearsay.

6              THE COURT:  Overruled.

7    BY MR. ACEVEDO-HERNÁNDEZ:

8    Q.        And what did those fellow Ñeta members that

9    came from Zarzales tell you about Bobe?

10   A.        One, the respect that they had for Bobe

11   since some years ago, several years ago.  He had

12   belonged to the maximum leadership, and they talked

13   about the substance that he managed together with

14   *Papito Machuca* in Zarzales.

15   Q.        And what substance is that?

16   A.        Heroin.  At least the one that he talked to

17   me about.

18   Q.        And did they tell you what he could do with

19   the heroin?

20   A.        The inmates that would tell me?

21             MR. ACEVEDO-HERNÁNDEZ:  Strike that

22   question.

23   Q.        The question is, do you know from what you

24   heard from those inmates that were fellow Ñeta

25   members if the drugs that Bobe dealt in Zarzales was

Miguel Álvarez-Medina - Direct

1    it only limited to Zarzales?

2    A.        Yes, because they would consume it in

3    Zarzales because in Zarzales the only drugs that are

4    there are from *Papito* and Bobe.

5    Q.        Sir, showing you Grand Jury Exhibit 19; do

6    you recognize that?

7    A.        Yes.

8    Q.        Who is that?

9    A.        Carlos Baez alias Carlitos Guaynabo.

10   Q.        Was he a member of the Ñeta gang?

11   A.        Yes.

12   Q.        What role did he have?

13   A.        He would deal with the finances of the

14   organization before 2010.  And in 2010 he was put as

15   the second in command of the maximum leadership since

16   the first one was Bonifacio López because Bengie "El

17   Gordo" had taken some time off.  And approximately in

18   October 2010 Bonifacio López is taken from the

19   institution to the United States.  And that's where

20   Carlitos Baez stays in the first position of the

21   maximum leadership.

22   Q.        And how do you know him?

23   A.        Well, at first I didn't know him physically

24   until 2015, but I did know him because of the

25   organizational chart that's passed throughout the

Miguel Álvarez-Medina - Direct

1    whole chapter just like the rest of the

2    organizational chart.

3              MR. ACEVEDO-HERNÁNDEZ:  Your Honor, we're

4    going into the matter that I mentioned previously.

5              THE COURT:  Okay, let's do this, ladies and

6    gentlemen, we're going to give you a quick ten-minute

7    break while we take up an evidence issue and then

8    we'll get you back here.

9              THE BAILIFF:  All rise.

10             (The Jury exits the room.)

11             THE COURT:  Have a seat.

12             MR. ACEVEDO-HERNÁNDEZ:  So, with the Court's

13   permission I'll inquire, if you'd like me to lay a

14   foundation.

15             THE INTERPRETER:  I'm sorry, Your Honor, the

16   witness needs to go to the bathroom.

17             THE COURT:  Okay.  Well, let me know when

18   he's ready please.  I'll be right out.

19             (The Court exits the room.)

20             (Jury trial recessed at 4:02 p.m. and

21   resumed at 4:10 p.m.)

22             (The Court exits the room.)

23             THE COURTROOM DEPUTY:  All rise.  Court's in

24   session.

25             (The Court enters the room.)

Miguel Álvarez-Medina - Voir Dire

1    THE COURT:  Mr. Acevedo, please.

2              VOIR DIRE EXAMINATION

3                      ---

4    BY MR. ACEVEDO-HERNÁNDEZ:

5    Q.        Mr. Alvarez, you identified earlier Viejo

6    Ten as a member of the Ñeta.

7    A.        Yes, Giordano.

8    Q.        And what role did he have in the

9    organization?

10   A.        At a certain point when the organization was

11   being created he was a pillar of the organization

12   since he got years for defending the ideals and the

13   thoughts of the Ñetas.

14   Q.        And specifically what did he do to defend

15   the ideals of the organization?

16   A.        In the seminars that we were given we were

17   taught that he spilled blood for the association.

18   Q.        And when you say that he "spilled blood,"

19   what do you mean by that?

20   A.        That he got to kill to be able to fulfill

21   the ideals of the association.

22   Q.        And you mentioned that you learned this

23   through the seminars; do you remember who in the

24   seminars told you this?

25   A.        Yes.  The seminars were given by all the

1  leaders that were in that chapter.

2  Q.      But specifically do you remember which

3  leader told you that Viejo Ten killed for the

4  organization?

5  A.      For example, in 292 José Fuentes Ayala a/k/a

6  Pepo Loiza.  In 1072, Wiso Plomo.  I specifically

7  remember those.

8          MR. ACEVEDO-HERNÁNDEZ:  Your Honor, we

9  submit that this is more detailed foundation.

10         MS. HILL-ADAMES:  May I cross?

11         THE COURT:  You may.

12                  VOIR DIRE CROSS-EXAMINATION

13                          ---

14 BY MS. HILL-ADAMES:

15 Q.      Good afternoon, sir.  You arrived in prison

16 in the year 2008.

17 A.      Yes.

18 Q.      Okay.  And when you say that Giordano

19 "spilled blood" on behalf of the Ñetas you are

20 referring to things that happened when?

21 A.      According to the seminars, in the eighties.

22 Q.      Because you were obviously -- were you born

23 in 1980?

24 A.      Yes, I was born in 1979.

25 Q.      Okay, so you were a year old?

Miguel Álvarez-Medina - Voir Dire

1    A.        Yes, I was young.

2    Q.        And then you said that Giordano had killed

3    people, right?

4    A.        According to what we were taught in the

5    seminars just like we were taught how the association

6    was formed and the history of the association.

7    Q.        Because you have no personal knowledge,

8    right?

9    A.        The knowledge that I had was what I was

10   taught in the seminars because they prepare warriors

11   to be affiliated to the Army of the Ñetas.

12   Q.        Do you know the names of the alleged victims

13   that Giordano killed?

14   A.        No.

15   Q.        Do you know the institutions where these

16   persons were killed, yes or no?  Yes or no?

17   A.        (In English.)  Yes.

18   Q.        Give me the institutions.

19   A.        According to the seminars, 308 and Malvinas.

20   Q.        Do you know how these persons were killed?

21   A.        We were always taught that knives were used.

22   Q.        But the truth is you have no personal

23   knowledge about this, this is just the doctrine that

24   they tell you, yes or no?

25   A.        The doctrine, yes.

Miguel Álvarez-Medina - Voir Dire

1  Q.      And this is something that happened over

2  40 years ago more or less?

3  A.      Approximately.

4  Q.      And the truth is that you've never done time

5  in the same institution as Giordano.

6  A.      Ponce 1000.

7  Q.      You did time with Giordano Santana?

8  A.      But not in the same unit.

9  Q.      So you never coincided physically with him

10 in the same module?

11 A.      Not in the same module.

12        MS. HILL-ADAMES:  I think that's my cross,

13 Your Honor.

14        THE COURT:  Done?

15        MS. HILL-ADAMES:  Yeah.  And then I would

16 argue but separate.

17        THE COURT:  Anything further?

18        MR. ACEVEDO-HERNÁNDEZ:  No, Your Honor.

19        THE COURT:  I'll hear you first.

20        MS. HILL-ADAMES:  In front of him?

21        THE COURT:  Sure, why not.

22        MS. HILL-ADAMES:  So this is the

23 government's third attempt, the third witness to

24 introduce the same kind of testimony, Giordano is a

25 pillar, he's an old prisoner, and he used to kill

Miguel Álvarez-Medina - Voir Dire

1   people on behalf of the Ñetas back in the 1980s,

2   third attempt.  The first one was Cruz-Santos which

3   initially Your Honor correctly pointed out that it

4   had been excluded based on a notice, but then I

5   argued it and Your Honor excluded it.

6           Now González-Gerena which will be the next

7   witness will attempt to say the same thing.  That one

8   Judge Pérez-Giménez entered into the merits at

9   Docket 1434 and excluded my motion *in limine*.  He

10  granted that and he denied the government's request

11  to seek that.

12          The argument is the same, Judge, I

13  incorporate all my arguments by reference.  Special

14  temporal -- special relevance requires temporal

15  proximity four years ago.  He was one years old when

16  this happened.  He doesn't have names of victims, he

17  knows a general sense --

18          THE COURT:  But he was able to tell him who

19  told him, he was able to tell him where they took

20  place, he was able to tell him the method that was

21  used.  Unlike Cruz-Santos who didn't know where the

22  ball was filled with air or feathers.

23          MS. HILL-ADAMES:  Your Honor, he's saying

24  that -- he emphasized.  He's like, according to what

25  they tell me at the seminar --

Miguel Álvarez-Medina - Voir Dire

1          THE COURT:  I understand.

2          MS. HILL-ADAMES:  I'm there's so many levels

3     of hearsay there.  It's so unreliable.  And, lastly,

4     there's no need for this evidence, Judge.  Giordano

5     Santana is not charged in Counts 3 and 4.

6          THE COURT:  Well, that's a better argument

7     than -- the 403 argument has a little more resonance

8     with me.

9          Let me hear from your brother and then I'll

10    come back.  Actually, you know what, let's do this,

11    let's get the jury in here, I'm going to send them

12    home so we can talk about this.

13         Can you bring them in, please.

14         You can have him out of here.  While we're

15    waiting, how are we doing on time?

16         MR. ACEVEDO-HERNÁNDEZ:  This is the end of

17    my direct.

18         THE COURT:  No, no, I'm sorry, overall case,

19    I apologize.

20         MR. ACEVEDO-HERNÁNDEZ:  Well, I expect that

21    we will be ending my case in chief early next week.

22         THE COURT:  How much evidence do you all

23    intend to put on?

24         MR. VÉLEZ-GOVEO:  At this point, Your Honor,

25    probably one or two witnesses for Miguel

Miguel Álvarez-Medina - Voir Dire

1   Rivera-Calcaño.

2           MR. GONZÁLEZ-DELGADO:  At this time I can't

3   answer that question, Your Honor.

4           THE COURT:  Fair enough.

5           MS. HILL-ADAMES:  I don't know yet, Your

6   Honor.

7           MS. LIZARRIBAR-MASINI:  I don't know yet,

8   Your Honor.  Maybe one witness.

9           MR. ACEVEDO-HERNÁNDEZ:  And we take the

10  opportunity to note that we haven't received any

11  reciprocal discovery just in case they are going to

12  present any.

13          THE COURTROOM DEPUTY:  A motion is pending,

14  Judge.  He requested I'm not sure if I sent you that

15  motion.  But the government requested --

16          (The Jury enters the room.)

17          THE COURT:  I apologize.  We're still

18  working through that evidence issue and it's getting

19  close enough to the end of the day that I didn't want

20  you hanging around any longer that you had to.  So we

21  will see you back here tomorrow ready to go at

22  nine o'clock.  And remember not to discuss the case

23  with anyone including each other.  Have a great

24  night.

25          (The Jury exits the room.)

1          MR. GONZÁLEZ-DELGADO:  There was an issue

2     pending with one of the jurors.

3          THE COURT:  Be seated, please.  So while I'm

4     thinking of it so that juror we just questioned he is

5     going to try to make the medical appointment for

6     tomorrow afternoon and we will be guided about

7     whether we're going to break or excuse him

8     altogether.  I'll keep you guys in the loop.  We'll

9     see what happens.

10         All right.  Let me hear from you.

11         MR. ACEVEDO-HERNÁNDEZ:  Yes, Your Honor.

12    First, Your Honor, as to Pérez-Giménez's ruling, and

13    briefly as to that, the Court's not bound by that.

14         THE COURT:  I know that.

15         MR. ACEVEDO-HERNÁNDEZ:  That's an

16    interlocutory determination.  And, by the way, our

17    position is that he never ruled, that that wasn't

18    clear from the docket.  But as to the merits of this

19    issue, Your Honor, what the Court has to determine is

20    whether the surrounding circumstance and the

21    statement itself has sufficient indicia of

22    reliability to be entered through the co-conspirator

23    exception -- co-conspirator statement.  There's many

24    items here that show reliability.  One, the witness

25    was able to say who are the declarants, where the

1    murders occurred, how the murders occurred and then

2    an approximate date of those. So the statement is

3    reliable.

4            As to temporal scope, like I mentioned, Your

5    Honor, the indictment here is not a ten-year

6    indictment, a 15-year indictment; this is an

7    indictment that charges the enterprise since the

8    beginning. It doesn't have -- the indictment doesn't

9    have a beginning date, it says beginning on a date

10   unknown no later than in or about the year 2005. So,

11   this portion of the organization, meaning the

12   eighties, falls within the scope or the temporal

13   scope of the indictment. That's why we've always

14   maintained our position that this is inextricably

15   intertwined.

16           Now, the relevance of this evidence

17   outweighs any unfair prejudice for many reasons.

18   One, the defense through cross-examination --

19           THE COURT: So before you get into that for

20   what specific purpose are you offering the evidence?

21           MR. ACEVEDO-HERNÁNDEZ: I am specifically

22   presenting this evidence to establish to the members

23   of this jury how is it -- and put into context how is

24   it that a member like Giordano becomes a pillar for

25   the organization because if not you don't -- there's

1    no way to put into context how is it that he receives

2    a pension in drugs, how is it that he has this power

3    to give orders, how is it that he can order sanctions

4    or change leaders like other witnesses said; because

5    he's earned this right.  And it also goes to prove

6    the existence of the enterprise, Your Honor, because,

7    as the indictment charges, this is an enterprise that

8    has been involved in murder.  So by proving that in

9    fact this organization has been involved in murders

10   since its origins it goes not only to prove his role

11   within the conspiracy but to prove the conspiracy and

12   the nature of the enterprise.

13          Also, Your Honor, the questions that have

14   been posed by defense counsel through cross have

15   been, in our opinion, to lay or give the impression

16   to the jury that her client was but a mere addict in

17   the prisons of Puerto Rico.  And this evidence would

18   also serve to rebut any allegation or any argument in

19   closing or anything in this closing that he was of

20   innocent involvement in the organization.  So, it

21   also serves that purpose, Your Honor.

22          So, we submit that the relevance of this

23   outweighs the danger of unfair prejudice because this

24   is not a drug conspiracy case only, this is a case

25   about murder.  It's a case where they have noticed

1    that there's enterprise engaged in murders.

2         THE COURT:  And there's been a lot of he

3    evidence about murders.

4         MR. ACEVEDO-HERNÁNDEZ:  Correct, Your Honor.

5         THE COURT:  All right.  So, look I -- I'm

6    hung up on the 403 issue so I'm going to exclude the

7    testimony as to the murders.  I'm going to let you

8    get into the history, okay, generally and the fact

9    that they had the seminars -- I know there's been a

10   lot of evidence of that -- and that the defendant's

11   name was used in those seminars without getting into

12   the specifics.  Okay?

13        MR. ACEVEDO-HERNÁNDEZ:  Okay.

14        THE COURT:  All right.  Now, question, do

15   you all have a conference either at when we break or

16   first thing in the morning to talk about what's

17   coming up for evidence so that we don't bump into

18   these evidence issues?  I know some of it is

19   inevitable; I just hate to take away from the jury's

20   time necessarily.

21        MS. HILL-ADAMES:  Your Honor, if we can get

22   the next three witnesses ahead of time --

23        THE COURT:  Who do you intend to call

24   tomorrow?

25        MR. ACEVEDO-HERNÁNDEZ:  So I have an issue

1    that the Court might want to us bring up.  But just

2    as to the witnesses, the next witnesses are

3    correctional officers that have seized drugs in the

4    prisons that have been mentioned by cooperating

5    witnesses.  After that we have José González-Gerena

6    that has also the 404(b) issue as to him, both as to

7    Defendant No. 4 Rolando Millan-Machuca and as to

8    Giordano Santana-Meléndez.  And those are the only --

9          And then we have at the end Osvaldo

10   Torres-Santiago which also has some additional 404(b)

11   as to Defendant No. -- as to one of the defendants or

12   two of them, I have to double-check.

13         THE COURT:  Do you think we'll get to all of

14   them tomorrow?

15         MR. ACEVEDO-HERNÁNDEZ:  All those witnesses?

16         THE COURT:  Yeah.

17         MR. ACEVEDO-HERNÁNDEZ:  No, I think tomorrow

18   we'll only get to the three correctional officers and

19   we'll start out the direct for José González-Gerena.

20         THE COURT:  How much left do you have with

21   this guy?

22         MR. ACEVEDO-HERNÁNDEZ:  15 minutes.

23         THE COURT:  Great.  How long are you all

24   going to be on cross?

25         MR. GONZÁLEZ-DELGADO:  I have no idea.  What

1    we request, Your Honor, is that since he's mentioning

2    that there are three correctional officers, we'd like

3    to have the names so we can review the evidence that

4    was provided in Jencks and discovery because if not

5    we're in the same position.  I don't know what I'm

6    going look for.

7         THE COURT:  You don't have to do that on the

8    record right now, but if you all to part this vail of

9    tears today share that information with your brothers

10   and sisters.

11        MR. ACEVEDO-HERNÁNDEZ:  Yes.

12        THE COURT:  Now, look, if there aren't

13   issues that you need to bring up, get with

14   Mr. Flaquer here and we will tee it up before nine

15   o'clock.  I'm here early and whenever you guys want

16   to talk we can do it.  I just want to try to maximize

17   the jury time, okay?

18        MR. GONZÁLEZ-DELGADO:  Yes, Your Honor.

19        THE COURT:  All right.  See you guys

20   tomorrow.

21        DEFENDANT RIVERA-CALCAÑO:  I wanted to

22   notify you that in the last time that we were in this

23   case the witness was -- that they were instructed to

24   not speak about what was occurring.  None of the

25   witnesses that have passed through this courtroom it

         1    has been indicated that they cannot speak about this

         2    case.

         3              THE COURT:  Let your lawyer talk.

         4              DEFENDANT RIVERA-CALCAÑO:  Okay, I'm sorry.

         5              MR. ACEVEDO-HERNÁNDEZ:  Your Honor, if I

         6    may, may I have the Court's permission to talk to the

         7    witness to instruct him.

         8              THE COURT:  Yes, yes, thank you.

         9              MR. VÉLEZ-GOVEO:  Your Honor, the question

        10    is being made that the witnesses prior to their

        11    testimony or for any reason they're given the

        12    instruction not to talk about the case with anyone

        13    concerning their testimony on what's going on in this

        14    courtroom, Your Honor.

        15              THE COURT:  I presume that the government

        16    has so counseled them.

        17              MR. ACEVEDO-HERNÁNDEZ:  Yes, we have, Your

        18    Honor.

        19              THE COURT:  I don't want to do it in front

        20    of the jury.  Okay?  All right thank you everybody.

        21              MR. VÉLEZ-GOVEO:  Thank you, Your Honor.

        22              (Jury trial adjourned at 4:30 p.m.)

        23                                ---

        24

        25

```
1    UNITED STATES DISTRICT COURT    )

2              OF                     )ss.

3         PUERTO RICO                 )

4

5

6

7                        CERTIFICATE

8

9

10           I, EVILYS E. CARRIÓN-ESQUILÍN, hereby

11    certify that the proceedings and evidence are

12    contained fully and accurately, to the best of my

13    ability, in the notes recorded stenographically by

14    me, at the jury trial in the above matter; and that

15    the foregoing is a true and accurate transcript of

16    the same.

17

18                        /s/ Evilys E. Carrión-Esquilín

19                        EVILYS E. CARRIÓN-ESQUILÍN, RPR
                          Official Court Reporter
20                        United States District Court
                          Federal Building, Room 200
21                        San Juan, Puerto Rico 00918
                          787-772-3377
22

23

24

25
```